613 So.2d 275 (1993)
Teresa Murphy BECKER, Plaintiff-Applicant,
v.
Manuel Allen BECKER, Defendant-Respondent.
No. W92-819.
Court of Appeal of Louisiana, Third Circuit.
January 4, 1993.
Writ Denied February 19, 1993.
Chris Roy, Alexandria, for plaintiff-applicant.
*276 Ralph Kennedy, Alexandria, for defendant-respondent.
Before STOKER, YELVERTON and COOKS, JJ.
YELVERTON, Judge.
The trial court changed domiciliary custody of two small children from the mother to the father, effective immediately. We denied a writ application. The Louisiana Supreme Court granted a writ, remanding the case to us to review the case on the merits, in an expedited manner. 602 So.2d 1010. The Supreme Court denied a request for a stay order.
The issue before us is whether the record supports the trial court order changing domiciliary custody. In our resolution of the issue before us we will be guided by the burden of proof rule announced in Bergeron v. Bergeron, 492 So.2d 1193 (La. 1986): When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.
The trial judge in this case found that the father, Manuel A. "Many" Becker, met the heavy burden of proof. The trial judge changed the domiciliary parent from the mother, Teresa Becker, to Many, the father. Our thorough review of this record convinces us that we should affirm.
The children, Patrick and Chase, were five and four years old, respectively, in June of this year when this case was tried. The parents, Many and Teresa, were married in 1984 and divorced in early 1989. Joint custody was ordered and Teresa was named the domiciliary parent. Many exercised his visitation as often as he could. Many was ordered to pay child support.
Teresa re-married in November 1989. Her new husband was Danny Artis. In 1990 she sued for past due child support. The rule was continued several times because Many was in the Virgin Islands, working.
In September 1990, after Many got back home, Teresa amended the rule alleging that Many was sexually abusing the boys, and requested that she be given sole custody.
Teresa testified at the trial of the rule in June 1992 that at first there was no problem with Many's visitation with the children. She testified that her first complaint of sexual child abuse was made to the Child Protection Agency in July of 1990. At that time she said she received an anonymous phone call from someone claiming to be Many's girlfriend who told her that he was hurting the children. She also testified that she told Many that he should let her new husband adopt the children.
The record shows that these two little boys knew a lot about sexual conduct. Dr. Deborah Myers, a pediatrician, saw Patrick and Chase when they were four and three years old and talked to them. She could not give an opinion, of course, on the source of the children's knowledge about sex, but she said that "these kids know a whole lot more about sex than they ought to." Where they got that knowledge, whether by experience or instruction, was the main fact issue in this case.
Two child psychologists assisted the trial court. Dr. John C. Simoneaux evaluated the children on September 6 and 10, 1990, after a referral by the Child Protection Agency. The results of these tests did not conclusively indicate that the children were sexually abused by their father, but they did suggest cause for serious concern. Dr. Simoneaux believed that the children had almost certainly been exposed to sophisticated sexual behavior in some fashion, explaining that children so young could not conceive of the things they knew unless they had been taught about the concept or the act was demonstrated. He pointed outand the record abundantly establishes thisthat the children had been questioned on the subject many times. He thought that the style and manner of this repeated scrutiny could possibly have influenced *277 their reports. He stated that the possibility that they had been coached to make these charges should be entertained. He also wanted to hear Many's side of the story and stated that an evaluation of Teresa might help to determine if it was possible that her judgment was clouded by the enmity she felt toward her ex-husband.
Dr. Daniel Lonowski began evaluations in October 1990 on referral by the trial court. Dr. Lonowski concluded that the children had been exposed to inappropriate sexual behavior. It appeared to him that the children believed that their father had sexually abused them. He stated, however, that there was a possibility that Teresa was propagandizing and was utilizing her children for retribution purposes. Dr. Lonowski also felt that secondary gain motivations for Teresa might have been an increase in her financial support base, or vengeance, or a leverage to force Many to allow her present husband to adopt the children. Dr. Lonowski suggested a conservative approach and counseling for both parents.
Teresa testified specifically to an incident which was alleged to have occurred in July 1991 at the Indian Festival in Marksville. The children were with Many and Many's mother, along with several other Becker family members, during a visitation. They were at the festival and Teresa said that the children told her of sexual abuse in the red bathrooms (portable bathrooms), and also in a pickup truck. Many's mother supposedly walked up on them at the truck and she slapped Many and Many slapped her. Detective Randy Bordelon was dispatched by the Rapides Parish Sheriff's Department to investigate this allegation. The oldest child told Donna Duncan, another detective with the Rapides Parish Sheriff's Department, that the incident occurred while they were at Many's mother's house.
In February 1992 the trial judge issued an "interim ruling", declaring that Teresa would remain the domiciliary custodial parent for the children and that Many would continue to have visitation, except that the visitation was to be under the supervision of the paternal grandmother, Mary Verheyden. The judge ordered further testing work by the psychologists.
Two weeks after the interim ruling requiring visitation under the supervision of the paternal grandmother, Mary Verheyden, the children were again evaluated by Dr. Lonowski. At about this time allegations surfaced that the grandmother, Mrs. Verheyden, had now started participating in the sexual abuse of the children. Teresa gave specific details of the grandmother's sexual activities. Dr. Lonowski was left to believe that the children had in fact been exposed to a sexually abusive experience while visiting with their father and grandmother.
As previously stated, Dr. Simoneaux initially was unable to determine what the truth was, but said it would be best to err on the side of caution in such a situation. In a report dated April 5, 1992, following extensive observation and testing of all parties concerned, including the children, Dr. Simoneaux concluded that Teresa and her current husband were doing whatever they could do to discourage the children's relationship with their father and his family. Nevertheless, he was still unable to say whether the allegations made by Teresa of Many's sexual abuse of his children were true or not. He found that there was no evidence to suggest that the children were exhibiting any kind of emotional disturbance in response to these events. He also testified that he observed the children for four hours and found that they did not express any fear or concern when they were around their father or grandmother. This was in direct contradiction to the testimony of Teresa and her present husband that the children were terrified of their father and grandmother. The results of Dr. Simoneaux's evaluation of Many and his mother gave no support to the idea that either could be capable of such acts. He found that Teresa had an extreme lack of regard for her ex-husband and his family. He stated that there was a strong potential that Mrs. Artis and her present husband were using the children as pawns in their continuing battle with Many. On the other hand, he conceded that if they truly believed that the children were being molested, *278 then their actions would be understandable. He said in his report that he did not envy the trial judge's responsibility in the matter, because there was no way to be certain of the correct decision. He was sure only that the boys were "truly the victims of the vindictiveness and/or perversities of the adults involved." In his report his concluding words contained the gloomy prediction that there were no practical solutions: "If the parents would grow up and act like responsible, caring adults, the children may have a chance."
To summarize Dr. Lonowski's opinion, while he held to the view that the alleged abuse actually happened, he admitted he could be wrong. He stated in court that if he was wrong, if the whole thing was a contrivance by the mother, so much harm had been done to the children that the mother "should have her rights terminated."
The trial lasted two days, and numerous lay witnesses testified. Most of these were members of Many's family, who recounted that his visitations with his children were generally turned into large family events, where everybody shared the pleasure of being with the two boys.
The trial judge was faced with a hard decision in this case. Nevertheless, performing his duty to decide cases, he decided this one. He made a determination of what the facts were. He gave a detailed and well reasoned explanation for his decision. In it, he made several credibility calls. In his written reasons he explained that the problem he was faced with was the damage caused by sexual abuse weighed against the damage caused by emotional abuse by using false allegations and allowing exposure to sexual knowledge. He found that the children had received a great degree of improper sexual knowledge. He did not believe that the allegations of sexual abuse were well founded. He found that Teresa had had almost exclusive control of the children and he felt that her exclusive control, combined with her efforts at removing Many's family from any sphere of influence, posed a risk to the children that was not in their best interests.
In short, the trial judge found that Many was not guilty of sexual abuse of the children, and that Teresa made it all up and planted the notion in the children's heads in order to alienate their father forever.
It is well established that appellate courts cannot disturb findings of fact of trial courts unless those findings are clearly wrong or manifestly erroneous. Based on a careful study of all of the testimony in this case, including the opinions expressed by the experts, we cannot say that the trial judge was clearly wrong in finding that Many was innocent and Teresa was guilty of being the source of the imparting of this knowledge about sex to the children.
The only remaining question is whether these facts legally constitute a basis meeting the burden of proof requirement for a change of domiciliary custody. We repeat the rule of Bergeron: When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.
Upon appellate review, the determination of the trial judge in child custody cases is entitled to great weight and will not be disturbed unless a clear showing of abuse of discretion is made. Stephenson v. Stephenson, 404 So.2d 963 (La.1981).
The legislature has determined that one of the factors affecting the best interest of the child is the willingness and the ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent. La.C.C. art. 131C(2)(j).
When one parent embarks on a planned course of action to destroy the parent-child relationship between the child and the other parent, this is not in the best interest of *279 the child. When that course of action involves planting in a child's mind knowledge of sexual practices that cannot be reasonably associated with sex education, and the inculcation of that knowledge is falsely attributed to child abuse by the other spouse, it takes no expert to realize that the resulting damage to the child is incalculable. A parent who will deliberately use such means to further selfish interests is acting in his or her own interests, and not in the child's interest. Civilized people abhor and condemn sexual child abuse. Bringing false charges of parental sexual abuse of children, and the deliberate use of the children as pawns to try to validate the charges, is equally despicable and condemnable.
This case was tried on this issue alone. No other evidence of the best interests of the children was introduced. We find no abuse of discretion in the action of the trial court in changing the domiciliary parent from Teresa to Many.
In this writ application Teresa makes three assignments of error. The first we have just finished addressing. The second is that the trial court erred in allowing the children to testify without the presence of the attorneys and on matters other than their preference as to which parent they wished to live with.
The trial judge, with the court reporter present taking down the testimony, attempted to interview the two children in the courtroom out of the presence of the parents, the attorneys, and everybody else. He announced his intention to do that, and nobody objected. We say "attempted" because we have read the transcription and note that the trial judge spent most of his time trying to keep the children from playing with the computers and from falling off the bench. His good intentions were thwarted by the children's lack of cooperation. We find it unnecessary to comment further on the propriety of the conduct of this interview. No harm was done to Teresa's case. We note that counsel for Teresa on appeal was not the counsel who represented her at the trial. Nevertheless, her counsel at the trial did not object to the interview being conducted without counsel's presence.
The third assignment of error is Teresa's argument that the trial court did not let counsel have a copy of the psychological report of Dr. John Simoneaux of April 5, 1992.
This assignment has no merit. The trial judge told the attorneys that he would provide copies of the reports to the attorneys from the doctors, in order to give them a chance to write briefs or cross examine the doctors if they wished. The record does not reflect whether the attorneys availed themselves of the opportunity, but the offer was made, and present counsel cannot complain.
For the reasons assigned, the judgment of the trial court is affirmed at the costs of Teresa Artis.
AFFIRMED.
COOKS, J., dissents and assigns written reasons.
COOKS, Judge, dissenting.
I respectfully dissent from the majority's affirmance of the order changing domiciliary custody of two minors from the mother to the father. While the majority acknowledges we should be guided by the burden of proof rule announced in Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), the ultimate deference they grant to the trial judge's factual conclusions represents a complete divergence from the "heavy" burden actually imposed in Bergeron.
The majority opinion faithfully recites the appellate review standard requiring that we give great weight to the trial Judge's determination and that reversal should not follow unless a clear showing of abuse is demonstrated. However, this procedural rule on appeal should not be allowed to weaken or supplant the evidentiary rule at the trial level expressed in Bergeron.
The heavy burden of proof rule requires that the parent seeking to change domiciliary custody must prove the continuation of present custody is so deleterious to the child as to justify a modification of the *280 decree, or establish by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages. The father simply did not meet this burden at trial.
The trial judge takes liberty with the evidence making several leaps over the puddle of opinions expressed by experts, who simply speculated that the events related by the children may have resulted from the mother's manipulation of their reality or multiple interviews by various individuals and agencies. They were more definitive in their conclusions that the children displayed signs of sexual abuse.
Despite a battery of testing and interrogations, the children continued to affirm incidents of sexual contact involving the father and his mother. The child protection agency, local law enforcement officers, two child psychologists and a pediatric physician all found sufficient cause for concern regarding the complaints made by the children.
Dr. John C. Simoneaux first evaluated the children and family members on referral by the Child Protection Agency. Dr. Simoneaux's initial findings were:
"The play of both boys with the anatomically correct dolls suggested that they have had some exposure to sexual stimulation. They displayed an unusual fascination, for their age, with the doll's genitals. Both indicated directly, as well, that their father had fondled their penis and performed oral sex on them. Chase, in particular, was quite explicit with his descriptions and even had the dolls simulate the act that he was describing."
While the results of the examination did not conclusively indicate the children were sexually abused by their father, Dr. Simoneaux found these results did suggest cause for serious concern. He was more positive in his findings that the children were "almost certainly" exposed to sophisticated sexual behavior in some fashion. He reasoned that children of this tender age simply could not conceive of oral sex unless they were taught the concept or unless the act was demonstrated in their presence.
Also, the children were examined by Dr. Daniel Lonowski on appointment by the court. He found the children's knowledge of sexual conduct was well beyond their expected maturity. In his report, he pointed to several indicators confirming the children were victims of sexual abuse. While he acknowledged the possibility that the children's account of the event could have been colored by successive interviews or manipulation by the mother, he dismissed the possibility of these occurrences based on the graphic descriptions given by the children and their demonstrated behavior. He also found that the children genuinely expressed fear and anger toward their father. This finding was not shared by Dr. Simoneaux who based on a single visit, when the children were accompanied by the father, concluded they did not demonstrate fear or anger while in the father's presence. Except for this split in opinions, both psychologists could only speculate that the children's versions of the sexual encounters could have been distorted by repeated interviews or the mother's conduct. The trial judge obviously focused on the latter "possibility." In his reasons for judgment, the judge attempts to piece together a puzzle that even the experts could not solve, despite their combined years of experience and training.
Thus, we are left to accept under the guise of appellant deference, the lone conclusions of the trial judge based on his in court observations and impressions of the father and his mother. These sterile observations and impressions, obtained in a setting where all parties are expected to put forth their best pictures, are hardly sufficient to meet the heavy burden of proof required in this custody case. Other than the trial judge's factual catapulting, nothing in the record or from the expert opinions suggests with any real certainty or even reasonable probability that the mother manipulated the children's experiences to such extent that they were able to convince two child psychologists, law enforcement officers, a pediatric physician and the child protection agency that good cause exist for concern about their sexual welfare. *281 Further, it is manifestly wrong to disregard the clinical findings of the experts suggestive of sexual abuse by interposing speculations and supposition to contradict the evidence; and to further overlook that the children were able to exemplify in a controlled, unrehearsed setting playful objective conduct with dolls suggestive of sexual behavior beyond their expected range of experience.
Admittedly the search for the truth in this case is understandably elusive. This is often the case when young children attempt to disclose sexual misbehavior by parents who possess superior articulation and defense skills in countering such allegations. However, we must not in our zeal to find an answer to this mystery, override clear evidentiary guidelines or potentially "chill" a mother's genuine efforts to protect her children from sexual abuse for fear that if she is unable ultimately to convince a trial judge of the accused parent's guilt she most assuredly will lose custody of her children.
For the foregoing reasons, I would reverse the trial judge's ruling finding he committed legal error in failing to properly impose the heavy burden mandated by Bergeron.
I respectfully dissent.