795 So.2d 1271 (2001)
Christy Dyan Lowe MASTERS, Plaintiff-Appellant,
v.
Jimmy Dwayne MASTERS, Defendant-Appellee.
No. 35,477-CA.
Court of Appeal of Louisiana, Second Circuit.
October 2, 2001.
Rehearing Denied October 25, 2001.
*1273 Richard L. Fewell, Jr., West Monroe, Bobby L. Culpepper, Counsel for Appellant.
Paul Henry Kidd, Jr., Monroe, Counsel for Appellee.
Before CARAWAY, PEATROSS & DREW, JJ.
PEATROSS, Judge.
This appeal arises from the trial court's judgment on a rule to change custody. The father, Jimmy Dwayne Masters ("Dwayne"), filed the rule on April 17, 2000, 12 days after this court rendered its opinion reversing a previous award of primary domiciliary custody to him. The trial court found that a material change in circumstances had occurred and that it was in the child's best interest that Dwayne's request to change custody be granted. It is from this judgment that the mother, Christy Dyan Lowe Masters Barkley ("Christy"), appeals. For the reasons stated herein, the judgment of the trial court is affirmed.

FACTS AND PROCEDURAL HISTORY
Christy and Dwayne were divorced on October 1, 1996. A consent decree was entered whereby Christy was named the primary domiciliary custodian of Tiffany Cheyenne Masters ("Cheyenne"). On January 22, 1997, Dwayne filed a motion to increase his visitation and reduce his child support obligation. Christy responded by requesting sole custody. On June 18, *1274 1998, Dwayne amended his pleadings, requesting primary domiciliary custody.
After Dwayne amended his pleadings, Christy began denying him his court-ordered visitation with Cheyenne and she also caused two investigations of sexual abuse to be instituted by the Department of Social Services, both of which were dismissed after thorough investigations because of insufficient evidence. Less than a week after the sexual abuse allegations were dismissed, Christy notified Dwayne of her intent to move to Atlanta, Georgia, with her new husband, Craig Barkley ("Craig").
On May 20, 1999, at the first trial, the Honorable Charles E. Joiner entered judgment for Dwayne, naming him primary domiciliary custodian. This court, however, reversed that ruling on April 5, 2000, stating that the parties had not shown a material change in circumstances because Christy had not yet moved when the trial court ruled. This court, therefore, reinstated the original consent decree of April 8, 1996. Masters v. Masters, 33,438 (La. App.2d Cir.4/5/00), 756 So.2d 1196 (Masters 1).
On April 17, 2000, Dwayne filed another rule to change custody wherein he alleged that a change in circumstances had occurred. This claim was based on Christy's move to Slidell and her attempts to estrange Cheyenne from him. A hearing was conducted on July 19, 21 and 26, 2000, by a different judge, the Honorable Marcus R. Clark, and the parties stipulated to the admission of all prior evidence and testimony that was received after the initial consent decree of April 8, 1996.
In mid-May 1998, Dwayne notified Christy of his intent to exercise his six-week summer visitation, which was not inconsistent with the consent decree. On June 17, 1998, Christy, without consent, took Cheyenne from Dwayne's parents. (This court, however, in Masters 1, stated that the language of the consent decree was ambiguous, but that it was not prudent for Christy to take the child from the paternal grandparents.) The next day, Dwayne sought an injunction prohibiting Christy from taking Cheyenne out of Ouachita Parish, which was subsequently granted. On July 2, 1998, the trial court issued a civil arrest warrant directing law enforcement officers to seize Cheyenne and return her to Dwayne so that he could exercise his summer visitation.
Witnesses testified that Christy made derogatory and negative comments about Dwayne and his family in front of Cheyenne and the record also shows that Christy created disturbances during some of the custody exchanges, necessitating the calling of the police on one occasion. The record also contains allegations by Christy concerning Dwayne's fitness as a parent. Some of her allegations, however, were conclusively proven to be false, while others were not corroborated by any other witnesses.
The trial judge found that a material change in circumstances had occurred and that it was in Cheyenne's best interest that Dwayne be named primary domiciliary custodian. On appeal, Christy asserts the following assignments of error:
1. The trial court erred in granting Dwayne primary domiciliary custody.
2. The trial court erred by not applying the Bergeron standard in changing custody.
3. The trial court erred in implementing the joint custody plan.
4. The trial court erred by allowing evidence that was considered in the previous custody hearing.
5. The trial court erred in applying La. R.S. 9:355, et seq.

*1275 DISCUSSION
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). On appellate review, the trial court's determination of custody issues is afforded great weight, and its discretion will not be disturbed on review in the absence of a clear showing of abuse. Estes v. Estes, 261 La. 20, 258 So.2d 857 (1972).
Where the original custody decree is a stipulated judgment, the party seeking modification of the decree must prove (1) that there has been a material change of circumstances since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731. The trial court determined that a material change in circumstances had occurred and that it was in Cheyenne's best interest that Dwayne be granted primary custody.
According to the trial court, Christy's move to Slidell, combined with her efforts to thwart the father-daughter relationship, constituted a material change in circumstances. The record shows that Cheyenne's support group, including all of her grandparents, live in Ouachita Parish, while there was no evidence of any support group in Slidell, excluding Christy, Craig and their baby. The testimony shows repeated instances in which Christy had attempted to thwart the father-daughter relationship; she made false allegations of sexual abuse; she caused problems during custody exchanges; she deprived Dwayne of some of his court-ordered visitation; she said that Dwayne and his family were crazy in Cheyenne's presence; and she told Cheyenne that Dwayne did not love her. The trial court was correct, therefore, in determining that a material change in circumstances had occurred.
Since a material change in circumstances had occurred, the trial court then correctly considered the best interest of the child. When determining the best interest of the child for purposes of making a custody determination, a number of factors must be considered by the court and there must be a weighing and balancing of the factors favoring or opposing custody in one party. Duvalle v. Duvalle, 27,271 (La.App.2d Cir.8/23/95), 660 So.2d 152. The best interest of the child is the paramount consideration in resolving a child custody dispute. La. C.C. art. 131. Rogers v. Stockmon, 34,327 (La.App.2d Cir.11/1/00), 780 So.2d 386. The Civil Code provides a list of factors to be used in weighing and balancing the best interest of the child.
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.

*1276 (6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
La. C.C. art. 134.
The trial court concluded, and we agree, that the love, affection and other emotional ties between each party and the child weigh in Dwayne's favor. Christy's ability to provide the more nurturing home for Cheyenne has been tainted by her constant efforts to thwart the father-daughter relationship. Cheyenne also has an established support system in Ouachita Parish that consists of Dwayne, his wife, his step-son and Cheyenne's maternal and paternal grandparents, who have a loving relationship with her. Only Christy, Craig and their baby live in Slidell. Dr. Tony Young, a psychologist who saw Cheyenne six times, testified that, since Cheyenne's support system was in Ouachita Parish, Cheyenne should reside with Dwayne in Ouachita Parish. He opined, therefore, that Cheyenne had stronger emotional ties in Ouachita Parish with Dwayne.
The factors concerning the length of time the child has lived in a stable, adequate environment, the desirability of maintaining continuity of that environment and the permanence, as a family unit, of the existing or proposed custodial home or homes also weigh in Dwayne's favor. Cheyenne has lived with Dwayne in the same location for over a year and there is no evidence in the record that he has ever moved from Ouachita Parish. Christy, however, has not maintained a continuous living environment; she moved from Ouachita Parish to Atlanta, Georgia, then from Atlanta, Georgia, to Slidell, Louisiana. Even though Christy testified at the two previous trials that she would remain in or move back to Ouachita Parish, she has failed to do so. We conclude, therefore, that Dwayne will provide a more stable and continuous environment for Cheyenne.
The factor concerning the moral fitness of each party, insofar as it affects the welfare of the child, also weighs in Dwayne's favor. The trial court found that Christy had committed perjury and coached Cheyenne concerning the false allegations of sexual abuse; and we agree that the foregoing bears negatively on Christy's moral fitness.
The trial court next considered the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party. The record shows that Dwayne has facilitated Cheyenne's relationship with Christy and her family by allowing extra visitation time, sending Cheyenne's school work to Christy and by promptly returning Christy's telephone calls. Christy, as discussed previously, has denied Dwayne some of his court-ordered visitation, denied him telephone contact by not accepting his calls, would not let Cheyenne attend her paternal great-grandfather's funeral, has acted belligerently toward Dwayne and his family in the presence of Cheyenne and told Cheyenne that Dwayne did not love her and that he and his family were crazy. Based on the evidence, it is the opinion of this court that Dwayne would facilitate and *1277 encourage a close and continuing relationship between Cheyenne and Christy, whereas Christy would continue to thwart the father-daughter relationship.
The distance between the respective residences of the parties is also a factor weighing heavily in Dwayne's favor. Christy's move to Slidell rendered the original custody plan impractical because of the distance between Ouachita Parish and Slidell, and she used that distance to further deny Dwayne his court-ordered visitation and telephone contact. On one occasion, Christy attempted to deprive Dwayne of his Easter visitation by asking him to drive to Slidell so that he could get Cheyenne. Knowing that Dwayne was driving to Slidell, Christy drove to Ouachita Parish with Cheyenne. Christy has made great efforts to use the distance as a device to further deny Dwayne his court-ordered visitation. It is, therefore, in Cheyenne's best interest for Dwayne to have primary domiciliary custody.
The trial court is not bound to give more weight to one factor over another; and, when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. Derbigny v. Derbigny, 34,672 (La.App.2d Cir.4/6/01), 785 So.2d 989. A trial court's assessment of the evidence is entitled to great weight and will not be disturbed absent a clear abuse of discretion. Rogers, supra. Since six of the factors listed in La. C.C. art. 134 favored Dwayne and none of the factors favored Christy, the trial court's decision that it is in Cheyenne's best interest that Dwayne be granted primary domiciliary custody will not be disturbed.
Christy, however, argues that the best interests of the child standard does not apply because the latest custody decree was a considered decree, thereby triggering the harsher standard of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). When there is a considered decree, the party seeking a change in custody must show that:
the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.
Bergeron, supra.
Christy first had the burden of proving that the custody decree was considered. "A considered decree is one for which evidence as to parental fitness to exercise custody is received by the court." Derbigny, supra, citing Oglesby v. Oglesby, 25,974 (La.App.2d Cir.8/17/94), 641 So.2d 1027. "A custody decree entered by default, or that is not contested, or by consent of the parties, however, is not a considered decree." Derbigny, supra. We are not persuaded by Christy's argument that the custody decree was a considered decree and, instead, agree with Dwayne's argument that the custody decree was not considered, as evidenced by this court's ruling in Masters 1, supra.
Masters 1 reinstated the original consent decree in this case, and it was still in effect at the time Dwayne filed for a change of custody. The application of the Bergeron standard, therefore, would be inconsistent with the opinion of this court.
Neither party successfully established a `material change of circumstances' sufficient to allow the court to reopen the custody issue for possible modification by reconsideration of the best interest of the child. Therefore, we find that the trial court erred in modifying the existing custody decree. Because we are required to reinstate the original custody *1278 decree, we pretermit a discussion of the remaining assignments of error.
Masters 1, supra.
In Masters 1, supra, we held that the trial court had erred as a matter of law in finding a material change of circumstances; and, therefore, we set aside the judgment of the trial court and reinstated the consent decree. Since we held in Masters 1 that the trial court erred as a matter of law, none of the evidence received by the trial court concerning the best interests of the child was considered by this court.
The opinion focused on two sets of facts when it decided that there was not a material change in circumstances warranting an analysis of the best interests of the child. In that opinion, we discussed the confusion between the parties concerning the 1998 visitation and the proposed move of the mother. Masters 1, supra. This court also mentioned some allegations of the mother, but stated that, since it was unknown when the allegations occurred, they could not be considered. The only other facts that are mentioned in Masters 1, besides procedural history, are contained in the "facts" portion and are not incorporated into the "discussion" portion.
The specific language in Masters 1, supra, that the court could not "reopen the custody issue for possible modification by reconsideration of the best interest of the child" because there was no showing of a material change in circumstances, combined with the conclusion that "the judgment of the trial court is reversed and set aside, and the original custody decree is reinstated," can reasonably be interpreted to mean that any evidence as to the best interests of the child was set aside and not considered. As previously stated, the only portion of the decree that was considered was whether a material change in circumstances had occurred.
This court's recent decision in Derbigny, supra, is instructive. The mother and father entered into a consent decree and the father subsequently filed a rule for contempt against the mother, which was denied. The father next filed a rule for contempt against the mother, combined with a request to change custody. The trial judge denied both requests, stating that the contempt allegations were the same as argued previously and that the father had presented minimal evidence as to the best interests of the child. That judgment was orally rendered on July 20, 1998. The father, in November 1998, filed another rule to change custody. This time his request was granted, and this court affirmed that judgment on May 5, 1999. Derbigny v. Derbigny, 99 32403 (La.App. 2d Cir.5/5/99), 744 So.2d 234; rev'd, 99-2008 (La.8/4/99), 747 So.2d 39. This court, however, was unaware of the July 20, 1998 judgment because that judgment was not signed until May 9, 1999 (four days after this court's opinion), and, thus, was not a part of the record when Derbigny was decided by this court the first time. The Louisiana Supreme Court, however, reversed and remanded the case back to the trial court, instructing it to perform a best interests of the child analysis. On remand, the trial court used the Bergeron standard and granted primary custody back to the mother. The father appealed. In that second appeal, this court held that Bergeron applied because of the July 20, 1998 judgment.
This court, in the second appeal of Derbigny, supra, reasoned that the Louisiana Supreme Court did not have the July 20, 1998 judgment since this court also did not have it. The July 20, 1998 decision denying the modification request, which was considered, is what makes the case sub judice distinguishable. Unlike Derbigny, Dwayne's evidence concerning parental fitness and the best interests of the child was *1279 never considered because this court set aside the modification order and reinstated the original consent decree. We believe, therefore, that the harsher standard of Bergeron does not apply in this case.
Assuming arguendo, however, that the harsher standard of Bergeron does apply, we conclude that Dwayne presented sufficient evidence to overcome the Bergeron standard.
Dwayne cites two cases which support his position that Christy's continued custody would be so deleterious to the child as to justify a modification of the custody decree. He first cites Becker v. Becker, 613 So.2d 275 (La.App. 3d Cir.1993), writ denied, 614 So.2d 65 (La.1993). The court, in Becker, found that the father met the Bergeron standard while only considering the false allegations of sexual abuse by the mother.
When one parent embarks on a planned course of action to destroy the parent-child relationship between the child and the other parent, this is not in the best interest of the child. When that course of action involves planting in a child's mind knowledge of sexual practices that cannot be reasonably associated with sex education, and the inculcation of that knowledge is falsely attributed to child abuse by the other spouse, it takes no expert to realize that the resulting damage to the child is incalculable. A parent who will deliberately use such means to further selfish interests is acting in his or her own interests, and not in the child's interest. Civilized people abhor and condemn sexual child abuse. Bringing false charges of parental sexual abuse of children, and the deliberate use of the children as pawns to try to validate the charges, is equally despicable and condemnable.
Becker, supra.
This court agrees with and adopts the foregoing language of Becker. False allegations of sexual abuse are so deleterious to a child that a change in custody is warranted, even under Bergeron, and it is undisputed that Christy's allegations of sexual abuse were false[1].
Dwayne next cites a case from the first circuit that supports the proposition that the Bergeron standard was met.
Proof of [the mother's] allegations [that the father's relocation from Baton Rouge, La., to Tupelo, Ms., caused harm to the mother-son relationship and proof that the father and his parents undermined the mother-daughter relationship] would prove that the present custody is so deleterious to the child as to justify modification of the custody decree, satisfying the first prong of Bergeron, as well as comprising the clear and convincing evidence that the harm likely to be caused by a change in environment was substantially outweighed by its advantages to the child, which the second, alternative prong of Bergeron requires.
Johnson v. Johnson, 590 So.2d 1325 (La. App. 1st Cir.1991).
Dwayne has shown that Christy intentionally thwarted the father-daughter relationship, made false allegations of sexual abuse, moved to Slidell, denied him telephone contact with Cheyenne and denied him his court-ordered visitation on several occasions. In fact, he has presented more evidence than Becker, supra, and Johnson, supra, combined, and those two cases support Dwayne's position that he met the Bergeron standard.
*1280 Christy next asserts that the trial court erred in not considering her proposed joint custody plan. The record shows, however, that Christy's counsel submitted her implementation plan on a computer disk. This argument, therefore, is without merit.
Christy further argues that the trial court erred in considering evidence from the previous custody hearing, even though she stipulated to its admission at trial. "The court shall determine all relevant factors in determining the best interests of the child." La. C.C. art. 132. Trial courts may consider evidence prior to previous custody awards in determining the best interests of the child. Hargrove v. Hargrove, 29,590 (La.App.2d Cir.5/9/97), 694 So.2d 645, writ denied, 97-1853 (La.10/31/97), 703 So.2d 24. We believe that, since this court in Masters 1 did not consider the facts as they related to the best interest of Cheyenne, all the facts submitted into evidence were relevant, and thus admissible.
Christy's last argument, that the trial court erred in applying La. R.S. 355 et. seq., is misguided. The trial court, in its reasons for judgment, stated that a material change in circumstances had occurred and that it was in Cheyenne's best interest for Dwayne to be the primary domiciliary custodian. We therefore conclude that this argument is without merit.

CONCLUSION
For the foregoing reasons, we affirm the trial court's decision that Jimmy Dwayne Masters be granted primary domiciliary custody of Tiffany Cheyenne Masters. Costs are assessed to Christy Dyan Lowe Masters Barkley.
AFFIRMED.
DREW, J., concurs with written reasons.
CARAWAY, J., dissents with written reasons.
DREW, J., concurring.
In Masters I, a panel of this court (two of whom form the current Masters II panel), vacated a trial court's custody decree. This was not done lightly, and certainly wasn't buttressed by a mere technicality. We were trying to do the right thing by this child, and we considered everything in the voluminous record.
Accordingly, I believe Bergeron applies, and would ordinarily bar the success of a filing for change of custody so soon after this court has made a custody ruling. However, under the facts of this now more voluminous case record, and noting that two learned trial judges came up with essentially the same ruling, I will concur, as I do think Bergeron has been met here.
CARAWAY, J., dissenting.
I respectfully dissent to the ruling of affirmance.
While this divided court now affirms the trial court's judgment effecting a change of custody, not surprisingly, a majority of this court, comprised of the two judges who "considered" the merits of the last appeal, recognizes that the Bergeron standard of review must apply in this case. Accordingly, because the trial court expressly rejected Bergeron's tougher test and committed legal error in its standard of review, the appellate court is required to determine the facts de novo from the entire record and render a decision on the merits. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731.
Regarding the Bergeron criterion for a prior "considered decree," I disagree with the holdings that Christy had "the burden *1281 of proving that the custody decree was considered" or that the "specific language" of this court's opinion in Masters I was deficient and somehow botched what might have been a considered decree by instead performing an inconsequential exercise, dodging the array of substantive charges between the parties in Masters I. The determination of a "considered decree" is a question of law based upon that which has previously transpired procedurally and substantively between the parties in the first litigated resolution of custody. It requires no new factual proof by Christy, but only the proper understanding of the legal standard which was applicable to the dispute in Masters I.
In Masters I, Dwayne challenged the prior consent decree of custody and litigated his claim for sole custody of the child. His burden was to prove a material change in circumstances. This jurisprudential legal standard for the non-Bergeron custody dispute and the test for the best interest of the child under La. C.C. art. 134 are interrelated and overlap. For example, under La. C.C. art. 134(7), the "mental and physical health" of each parent is one of twelve factors used to determine the child's best interest. Nevertheless, if a domiciliary parent, such as Christy, has a total mental or physical health breakdown following a consent decree of custody, that decisive best interest factor and proof of a material change of circumstance can be one and the same. Therefore, a court's determination that a primary custodial parent's health has or has not deteriorated or materially changed to a level affecting the welfare of the child can be the determination of the child's best interest.
The grounds for Dwayne's custody challenge in Masters I involved three or more of the factors enumerated under Article 134. Dwayne attempted to elevate those factors to the level of a material change of circumstance. Dwayne's brief to this court in Masters I did not rest its principal argument upon the trial court's questionable decision that Christy was moving to Atlanta and had no option to recant her plans to move. Instead, he first argued as follows:
Although the "option" issue [to move to Atlanta] will be further addressed hereinbelow, DWAYNE avers that the Trial Court changed primary custody not so much due to CHRISTY's move to Georgia, but due to CHRISTY's bad faith, due to CHRISTY's repeated violations of court orders, due to CHRISTY's two separate false allegations of sexual and physical abuse, and due to CHRISTY's never-ending attempts to destroy the child's relationship with her Father. The evidentiary basis for the foregoing conclusion, as well as the Trial Court's change of primary custody, were already developed in Argument VII.A, directly hereinabove. In short, Appellant's "option" argument is not applicable to this case's change of custody because DWAYNE had already reconvened for primary custody.
(Appellee's Original Brief, page 9, Masters I, bracketed information inserted.) Dwayne's assertion of Christy's false allegations of sexual and physical abuse were serious charges implicating at least two of the factors for the child's best interest, La. C.C. arts. 134(6) and (10).[1] Likewise, the allegation that Christy attempted to destroy the child's relationship with Dwayne *1282 involved an alleged breach of factor 10. This court's opinion expressly addressed one of those situations concerning the parties' battle over the child's affections in the summer visitation dispute of 1998, with which the trial court was concerned in Masters I. The only other factor upon which the trial court based its ruling in Masters I was Christy's proposed out-of-state move, which concerns factor 11 of Article 134 and which, in most cases, constitutes a material change of circumstance. Evans, supra at 738. Apart from those two issues upon which the trial court erroneously ruled in Masters I, the trial court made the following statement indicating that Dwayne's other charges, including the serious charge of false allegations of sexual abuse, were not proven in Masters I:
"I think from the testimony that's been presented here that the young parents were able to work with each other for a period of time and then something happened, probably I think what triggered it undoubtedly must of been this planned move out of the state."
This court agreed that Dwayne's other charges which he argued in his brief, as quoted above, were not proven and that no material change of circumstance was shown. That ruling, based upon a finding of no breach of Article 134's factors, was co-existently a ruling on the best interest of the child. In returning custody to Christy, we "considered" 765 pages of the transcript of the four day trial in Masters I. With the characterization of Christy depicted in Dwayne's brief which we found unsupported in the record, this court's overruling of the trial court and the return of custody to Christy mandated consideration of the child's best interest, the paramount test in all custody rulings. Dwayne was given a full and fair opportunity to litigate custody at both the trial court and this court, and the final judgment resulting from Masters I, rendered April 5, 2000, was far from a consent decree.[2]
Twelve days later, on April 17, 2000, Dwayne commenced Masters II. The "Motion for Contempt and Temporary Restraining Order" filed on that date is particularly telling. His first allegation concerned the fact that in January 2000, while Masters I was pending in this court, and while Dwayne was the primary custodian, Christy moved to Slidell. Because this court's ruling in Masters I re-established Christy's primary custody, Dwayne alleged that two days later, on April 7, 2000, she had wrongly taken the child and "permanently changed the minor's residence to Slidell, Louisiana, which is more than 150 miles from the child's principle [sic] domicile at the time of the current custody order" in violation of La. R.S. 9:355, et. seq. (Paragraph 6 of Motion). The allegation should have more accurately reflected that this court's ruling changed the place of the child's primary residence under the peculiar circumstances of the case, which is hardly a violation of the notice requirements of Louisiana's child relocation statute. In fact, further evidencing the specious nature of this technical notice violation, paragraph 9 of the motion for contempt admitted:
"9.
Although the Mother advised Mover of her new address on January 20, 2000, *1283 this was done in her capacity as non-domiciliary parent due to the court order that both parties keep the other advised of his/her respective address. The Mother did not become domiciliary parent until April 5, 2000, and she took the child to South Louisiana on April 7, 2000, without following the procedure of LSA-R.S. 9:355.1."
Next, Dwayne alleged his second ground in the parties' new custody battle, as follows:
"10.
Now, to aggravate matters further, Defendant in Rule has advised Mover that he cannot exercise his alternating weekend visitation unless he both drives down to Slidell to pick up the child on Fridays and then drives back down to Slidell to return the child on Sundays. Mover buckled into this outrageous demand in hopes of seeing his daughter. Then Defendant in Rule then reneged and actually forced the minor child to call Mover, while sobbing, and beg Mover not to exercise his visitation. In short, Defendant in Rule has already advised of her intent to deny Mover his first alternating weekend visitation as was scheduled to commence on Friday, April 14, 2000. Mover alleges that this is a volitional intentional and knowing contempt of court for which Defendant in Rule should be punished and cast with attorney fees and court costs."
Finally, in view of the apparent weakness of Dwayne's initial assertions, paragraph 11 of the motion for contempt reasserts, in eight subcategories, all of the prior Masters I grounds relating to the parties' conflict between 1997 and the first trial of the case in April 1999. Twelve days after this court's conclusion that a material change of circumstance had not been proven and that Christy's primary custody be re-established, Dwayne's motion concluded to the contrary that "the foregoing facts constitute a change of circumstances sufficient to change primary domiciliary custody of the minor to Mover." Through the TRO of April 17, Christy was ordered to immediately return the child to Ouachita Parish "with the minor child to remain in Ouachita Parish until the resolution of the hearing scheduled" for June 22, 2000.
We are now presented with a second record of 697 pages of testimony contesting the issues raised in Dwayne's new motion for contempt and rule for custody. The old sores of Masters I have been reopened. Despite no proof of a false assertion of sexual misconduct since the first trial of April 1999, Dwayne would like to revisit that explosive issue, citing this court to again review the transcript of the first trial. Instead, the only event for resolution occurring after this court's April 5, 2000 ruling in Masters I, resulted from a response to the TRO served on Christy on April 20, the Thursday before Easter, as described by the trial court:
There was also testimony regarding Christy's attempt to deprive Dwayne of his Easter 2000 visitation. Christy told Dwayne to drive to Slidell to pick up Cheyenne, which Dwayne did. While Dwayne drove to Slidell, Christy departed for Monroe. At no time did she inform Dwayne of her change in plans.
When Christy dropped Cheyenne at Dwayne's house, she made a scene in front of Dwayne's sister, Tammy Reeves, and his neighbor, Mrs. Melba Collum. Both testified that Christy was belligerent and angry when she arrived and learned that Dwayne was not there. Most disturbing was their testimony that Christy referred to Dwayne's family as "crazy" and "mixed up." This derogatory outburst occurred in Cheyenne's presence.
While warring between the parties is never justified, Christy's reaction to *1284 Dwayne's new legal volley through a wrongfully issued TRO[3] is the type of conduct which the lack of a Bergeron standard inevitably promotes. Dwayne's ex parte pleading requesting the TRO omitted the Bergeron standard, and with its issuance, the legal proceedings spiraled downward from there. As the Bergeron court stated:
A heavy burden of proof in custody modification cases is justified for several reasons. In the usual civil case a mistaken judgment for the plaintiff is no worse than a mistaken judgment for the defendant. However, this is not the case in an action to change a permanent award of custody. The available empirical research data and psychiatric opinions indicate a need for strict standards that set clear boundaries for modification actions. There is evidence that more harm is done to children by custody litigation, custody changes, and interparental conflict, than by such factors as the custodial parent's post divorce amours, remarriage, and residential changes, which more often precipitate custody battles under liberal custody modification rules than conduct that is obviously harmful to the child, such as abuse or serious neglect, which justifies intervention to protect the child under the court's civil or juvenile jurisdiction.
Bergeron v. Bergeron, 492 So.2d 1193, 1199 (La.1986).
In summary, I find that Bergeron applies, and respectfully disagree with one member of this court on that issue. This court is not bound by the fact finding of the trial court, which rejected the proper legal standard of review and discussed events already adjudicated in Masters I in its reasons for judgment. Therefore, I respectfully disagree with the other member of this court who feels bound by the fact finder. Christy's move to Slidell and her misconduct in reaction to the TRO are not "so deleterious to the child as to justify modification of the custody decree," and likewise, Dwayne did not prove "by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child." Bergeron, supra at 1200. Accordingly, I would reverse the trial court's ruling.
APPLICATION FOR REHEARING
Before, BROWN, WILLIAMS, CARAWAY, PEATROSS, and DREW, JJ.
Rehearing denied.
NOTES
[1] At oral argument before this court, Dwayne's counsel stated that Cheyenne's therapy, which resulted from the false allegations, continued after the first trial.
[1] La. C.C. art. 134(6). The moral fitness of each party, insofar as it affects the welfare of the child.

La. C.C. art. 134(10). The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
[2] There is no dispute that the trial court's ruling against Christy changing custody in Masters I was a "considered decree" and that had the judgment not been overruled, the Bergeron burden was upon her. The litigation itself is what makes the decree "considered" in contrast to a consent decree. The outcome of the litigation makes no difference, because the resources of the court and trauma to the parties and the child have been expended in the litigated consideration of custody. Bergeron allows that expenditure under the less stringent, material change of circumstances standard only once.
[3] Nowhere in the child relocation Act (La. R.S. 9:355.1, et seq.) is there a reference to injunctive relief. Given the specious nature of Dwayne's argument under the Act and the authority of this court's judgment twelve days earlier, the ex parte issuance of a TRO was groundless and in circumvention of this court's ruling.