ROSEMARY LEDET, Judge.
|, This is a contentious child custody dispute. From a judgment awarding joint custody to both parents, designating the mother as domiciliary parent, and refusing to grant the father’s request for a protective order on behalf of the child, the father *798 appeals. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
The parties, Amelia Alfonso and Brett Cooper, are the biological parents of a minor child, A.C.,[1] who was born on October 27, 2006. The parties never married. When the child was born, the parties were living together in St. Bernard Parish. For about five years after the child was born, the parties continued to live together there. The parties separated in March or April 2012. After they separated, Mr. Cooper remained in St. Bernard Parish for a few months and then moved to St. Tammany Parish. Ms. Alfonso continued to reside in St. Bernard Parish.
lain July 2012, the parties entered into a notarized, extra-judicial agreement, entitled a “Joint Custody Implementation Plan” (the “Agreement”).[2] The Agreement addressed multiple issues and included the following pertinent provisions:
• The parties are both fit and proper persons to have the care of the minor child. The parties consider legal custody to be joint and equally shared.
• The mother will be the domiciliary] parent. Both parents will be responsible to share equally for the expense for any medical or dental bills concerning the child.
• Each party will keep the other party advised as to any serious illness or other major developments with respect to the child.
• Each party will share in equal visitation of the minor child.
The visitation schedule provided for in the Agreement called for the parties to each have physical custody of A.C. for two days during the week and for alternating weekends from Friday to Sunday. In November 2012, when Mr. Cooper moved to Slidell, the parties agreed to change the visitation schedule to week-to-week.
On February 21, 2013, Ms. Alfonso commenced this custody dispute in St. Bernard Parish. She requested that the parties be granted joint custody of A.C., that she be designated domiciliary parent, and that Mr. Cooper be granted visitation and bordered to pay child support. She alleged in her petition that Mr. Cooper had threatened to not return A.C. to her at the conclusion of his agreed upon visitation;[3] to remove A.C. out of her school in St. Bernard Parish; and to enroll her in school in St. Tammany Parish (Slidell), where he was living. Ms. Alfonso thus requested, and was granted, a temporary *799 restraining order (“TRO”) prohibiting Mr. Cooper from removing A.C. from either her school in St. Bernard Parish, which was Gauthier Elementary, or the court’s jurisdiction. Ms. Alfonso further requested, and was granted, a TRO prohibiting Mr. Cooper from threatening, harassing, intimidating, or otherwise harming her.[4] The trial court set the trial on Ms. Alfonso’s rule for custody for March 15, 2013.
On March 13, 2013, Mr. Cooper filed an answer and a reconventional demand. In his verified pleading, he denied all of Ms. Alfonso’s allegations and requested that the parties be granted joint custody with him named as domiciliary parent. He also requested to continue the existing schedule of week-to-week rotating physical custody and for Ms. Alfonso to pay him child support. In his verified pleading, Mr. Cooper made the following allegations:
[Mr. Cooper] resides in a 4 bedroom house and ... the minor child has her own room at his home. [Ms. Alfonso] has bounced from location to location since the relationship between she [sic] and [Mr. Cooper] has ended. [Ms. Alfonso] has had 5 different addresses in the past year. Upon information and belief, the minor child has to share a bed with her mother while living at the home of the paternal |4grandparents [Mr. Cooper’s parents].[5] The minor child has also relayed to [Mr. Cooper] that she has had to sleep on the floor as mommy’s boyfriend was sleeping over. [Ms. Alfonso] has exposed the child to her various boyfriends and has had the child overnight while spending the night with her boyfriends.
[Mr. Cooper] states that he can provide the child with needed stability.
[Mr. Cooper] states that the minor child suffers from anxiety and that the anxiety symptoms presented as chest pain. [Ms. Alfonso] delayed bringing the child to the doctor for counseling -[Mr. Cooper] stepped in and got the child scheduled for counseling.[6] *800 [Mr. Cooper] states that upsetting the child further by changing the week to week rotating schedule ... will certainly cause her added anxiety.
[Ms. Alfonso] smokes in her car and in the presence of the minor child. The minor child has relayed to her father that she has | ¡¡asked her mother to stop smoking around her but that her requests are ignored.
Based on the last allegation, Mr. Cooper requested that the trial court order Ms. Alfonso not to smoke either in any vehicle that the minor child will be transported in or in any home where the minor child will be present.
On its own motion, the trial court continued the March 15, 2013, trial date and reset it for April 26, 2013, because the court was moving to a new courthouse. On April 26, 2013, the parties met in court and agreed to continue the trial date to May 20, 2013.
On May 1, 2013, Ms. Alfonso filed a Motion for Temporary Exclusive Use of a Vehicle. In her motion, she alleged that on April 30, 2013, Mr. Cooper showed up at her place of employment and “attempted” to have the vehicle the parties eo-owned towed without informing her.[7] She alleged that the vehicle was “the only source of transportation for mover [her] and her minor child.” She requested that she be granted immediate exclusive use and possession of the vehicle. The trial court granted Ms. Alfonso immediate exclusive use of the vehicle pending the hearing and ordered her to “pay the mortgage note and maintain insurance on the said vehicle during the pendency of these proceedings.” The motion was set on the same date as the pending custody trial, May 20, 2013. Thereafter, the trial date was | fireset to August 1, 2013. Meanwhile, on June 26, 2013, a consent judgment was entered into regarding the vehicle. Pursuant to the consent judgment, Mr. Cooper was granted exclusive use of the vehicle; and he assumed full responsibility for the mortgage.
On the afternoon of July 31, 2013, Mr. Cooper’s attorney notified Ms. Alfonso’s attorney for the first time that Mr. Cooper had taken A.C. to Children’s Hospital and the Audrey Hepburn Care Center (the “Care Center”) based on an allegation that A.C. had been sexually abused by Ms. *801 Alfonso’s new husband, Kendal Serigne.[8] Given the disclosure of this information to Ms. Alfonso’s counsel coupled -with the fact that Ms. Alfonso likewise had not been informed of the allegation, the August 1, 2013, trial was converted to a status conference. The trial date was reset in order to allow the parties adequate time to conduct discovery and to investigate the new allegation.
Also on August 1, 2013, Mr. Cooper filed a rule for ex parte custody requesting that the trial court grant him temporary sole custody of A.C. without a hearing. In his pleading, he alleged that the basis for his request was as follows:
[Approximately 3 months ago ... [Ms.] Alfonso became romantically involved with ... KS. Shortly after the relationship between KS and Amelia Alfonso began, the minor child relayed to her father that she, the child, was sharing a bed with her mother and KS and that she didn’t like doing so.... [Mr. Cooper] advised the child to tell her mother and KS that she did not want to share a bed with them and that they were not allowed to share a bed with the child.... [Mr. Cooper] states that Amelia Alfonso has allowed the child to share a bed with her and boyfriends prior to the incident involving KS. Despite the child telling her father that she had relayed to her mother and KS that they shouldn’t be sharing a bed, the bed sharing 17continued.[9] ... [Mr. Cooper] states that following the inception of the relationship between Amelia Alfonso and KS that the minor child began exhibiting increased signs of anxiety/stress and began complaining of physical symptoms (redness/itehing/discharge) of her genital area and expressing anger/anxiety over being returned to her mother’s care, crying, acting out as the week with her father came to an end, begging to not be returned to her mother.... [Mr. Cooper] states that the child began wetting the bed while in her mother’s care (the child relayed this to her father), repeatedly telling her father that KS was ‘mean’ to her and that she didn’t want to be around him_ [Mr. Cooper] states that the child has been treated in the past for stress/anxiety issues and that the child’s exhibition of increased distress caused him to seek out a counselor to address the child’s increased signs of distress.
[Mr. Cooper] ... states that he had the child ... seen by Patrice Allen,[10] a counselor, at Abundant Health, Inc. Following her initial examination of the child Patrice Allen told Brett Cooper that she was obligated to contact DCFS [the Department of Children and Family Services]. Patrice Allen also advised Brett Cooper to have the child examined by a pediatrician. Brett Cooper then contacted Dr. Kristy Moody, a pediatrician [in Tangipahoa Parish], who informed him to bring the child to Children’s Hospital. The child was then taken to the ER [emergency room] at Children’s Hospital, examined and referred to Children’s Care Center (Audrey Hepburn Care Center)[“the Care *802 Center”]. The minor child relayed to the Care Center that her mother made her share a bed with she (her mother) and KS, that KS put his hand on her below her belly button and threw his leg over her while he slept. The child also expressed being uncomfortable with her mother and KS drinking beer and french kissing in front of her. The child expressed to the therapist that she did not feel safe with her mother. The child’s physical symptoms coupled with the answers to questions asked of her resulted in the Care Center recommending protective placement of the child and that the child be kept away from KS during the investigation. [Mr. Cooper] ... states that the Care Center has contacted DCFS to begin an investigation into this case.
Mr. Cooper further alleged that Ms. Alfonso and KS, Kendal Serigne, were married on July 26, 2018, and that he is unable to communicate with Ms. Alfonso regarding the minor child.
| ^Before the August 1, 2013, status conference, the parties’ attorneys obtained the records from Children’s Hospital and the Care Center; those records were presented at the status conference. At the conclusion of the status conference, the trial court denied Mr. Cooper’s request for temporary sole custody. At the status conference, the parties’ attorneys agreed that the parties would submit themselves, A.C., and their significant others to a custody evaluation. It was understood that the parties would continue alternating physical custody of A.C. on a week-to-week basis pending the outcome of that evaluation. During the status conference, the trial court judge specifically informed the parties’ attorneys to instruct the parties to keep A.C. in her school in St. Bernard Parish (Gau-thier Elementary), which she had attended for the prior two years, until the trial was conducted.[11]
On August 6, 2013, five days after the status conference, Mr. Cooper filed a Petition for Protection from Abuse, pursuant to La. R.S. 46:2131, in St. Tammany Parish on behalf of A.C. against Mr. Serigne. In his petition, Mr. Cooper alleged that on August 2, 2013, A.C. made additional specific allegations against Mr. Serigne; particularly, the petition included the following paragraph describing the alleged abuse (the “Paragraph”):
The petitioner is the father of the minor daughter named in this petition. There is no custody established, the minor child visits one week on and one week off with her father and stepmother in St. Tammany then with her mother and stepfather in St. Bernard Parish. On the above date [August 2, 2013,] the minor daughter told her father and stepmother that when she visits her mother and stepfather she sleeps with them in the bed and the defendant (the stepfather) sleeps with his arm and leg over her. The minor child told [her] father and her stepmother “that the defendant touches her private and applies pressure and it hurts.” The petitioner contacted DCFS and made a report. The social worker came out and talked to the minor child and then a police report was filed. The detective working the case advised 19the petitioner to seek an order of protection on behalf of the minor child.[12]
*803 In his petition, however, Mr. Cooper failed to mention the pending custody proceeding in St. Bernard Parish.[13] Granting Mr. Cooper’s request for a TRO, the St. Tammany court ordered that Mr. Serigne be restrained from committing further acts or threats of abuse. The St. Tammany court further ordered that Mr. Cooper have temporary sole custody of the minor child.
On August 12, 2018, Mr. Cooper filed an amended petition in St. Tammany Parish in which he disclosed that there was a custody suit pending involving the minor child in St. Bernard Parish. On that same date, the St. Tammany court entered an order allowing Mr. Cooper to file the amended petition. It further ordered that “[a]s there is no custody order in effect, all prior orders of this Court remain in full force and effect.”
On August 19, 2013, Ms. Alfonso filed a Motion to Reset Rule for Custody and Request for Expedited Hearing. In her motion, she stressed that, in the initial petition he filed in St. Tammany Parish, Mr. Cooper failed to inform the St. Tammany court of the pending St. Bernard Parish custody proceeding. She further stressed that Mr. Cooper failed to inform her that he had filed such a pleading, that Mr. Cooper had withheld the minor child from her, and that he had enrolled the | inminor child into school in St. Tammany Parish (Slidell). Based on this motion, the trial was reset for September 6, 2018.
Meanwhile, on August 21, 2013, Mr. Cooper filed a Petition for Protection from Abuse on behalf of A.C. in St. Bernard Parish.[14] In his petition, he repeated the Paragraph regarding the alleged abuse, quoted above, and he added the following two sentences to the end of the Paragraph: “[t]he detective [St. Bernard Parish Police Department Detective Sergeant Robert Garofalo] set up a forensic interview for [A.C.] ... and is now awaiting the report from the Audrey Hepburn Care Center. Detective said [A.C.] gave a great statement and he is doing an investigation.”
Mr. Cooper’s St. Bernard Parish Petition for Protection from Abuse was assigned a new case number, but allocated to the same division as this custody case. The duty judge — who was not the trial judge in this case — granted Mr. Cooper’s request for a TRO against Mr. Serigne and awarded him temporary custody of A.C. The parties agreed that the TRO would remain in effect until the trial date in the custody case, and the trial court agreed to hear both matters together.
On September 10, 2013, a one-day trial on both matters — the motion for protective order and custody — was held. At trial, the following six witnesses testified: (1) the mother, Amelia Alfonso; (2) the mother’s husband, Kendal | n Serigne; (3) the father, Brett Cooper; (4) the father’s wife, Gina *804 Cooper; (5) the father’s mother, Sharon Cooper; and (6) St. Bernard Parish Police Department Detective Sergeant Robert Garofalo. At the close of the evidence, the trial court took the case under advisement, noting it was an “intense” case. However, the trial court orally instructed the parties that the mother, who had not had visitation -with the child for forty-three days, was to have visitation with the child over the weekend. The trial court admonished the parties that there was an “OCS[15] safety plan” in effect, with which the parties were required to comply and over which the court had no control.[16]
On September 16, 2013, the trial court rendered judgment granting the parties joint custody of the minor child, A.C., and designating the mother, Ms. Alfonso, as the domiciliary parent with immediate physical custody of the child. The court also set a subsequent hearing on September 24, 2013, on the issues of child support, visitation, and other issues, including counseling for all parties involved in rearing the child. The trial court, in its written reasons for judgment, stated:
This matter was presented to the court during a one day trial on a rule to show cause. The court finds both parents have a deep love and sincere interest in the minor child, [A.C.].
11gFor the last two years, the child was attending school in St. Bernard Parish and, according to the testimony, was well adjusted and happy. The court determines that the child’s best interests dictate she remain in school in St. Bernard.
At the time of the filing of the original Rule for Custody and Child Support dated February 21, 201[3], an allegation was made that defendant, Brett H. Cooper, was threatening not to return the minor child to petitioner, Amelia Alfonso, and threatened to move the child to another school. Despite a court order issued February 22, 2013, prohibiting Brett Cooper from removing the minor child from her school, he has done just that.
Allegations were made of inappropriate contact made to the minor by petitioner’s new husband, referred to as KS, in a Rule for Exparte [sic] Custody. In the hearing, Defendant-in-rule, Brett Cooper, was not able to demonstrate to this court that the allegations had merit. In fact, his actions taken when the court advised counsel that it would not grant exparte [sic] custody but would give expedited consideration for the rule, prompted Brett Cooper to enroll the child in a St. Tammany Parish school and preclude visitation to the mother for a period of forty-three days. The court is mindful of the gravity of the allegations, but without more proof cannot consider them.
The court finds that it is in the best interest of the minor, [A.C.], to have her mother as the domiciliary parent.
This appeal by the father, Mr. Cooper, followed.
*805 DISCUSSION
Although Mr. Cooper failed to assign any errors in his appellate brief, the gist of his contentions on appeal is that the trial court erred in the following two respects: (i) failing to grant his request for a protective order on behalf of the minor child, and (ii) designating Ms. Alfonso as domiciliary parent. We separately address each issue.
(i) Protective order on behalf of minor child
The focal point of the instant case is Mr. Cooper’s allegation that A.C. was sexually abused by Mr. Serigne while in Ms. Alfonso’s custody. Mr. Cooper contends that the trial court abused its discretion in failing to find that the | ^allegations of abuse against the minor child were proven by a preponderance of the evidence. He further contends that the trial court erred in failing to grant a protective order in favor of A.C. against Mr. Serigne pursuant to the provisions of the Domestic Abuse Assistance Law, La. R.S. 46:2131-2143.
The purpose of the Domestic Abuse Assistance Law is to “provide relief to victims of domestic violence by establishing a ‘civil remedy for domestic violence which will afford the victim immediate and easily accessible protection.’ ” Vallius v. Vallius, 10-0870, p. 5 (La.App. 4 Cir. 12/8/10), 53 So.3d 655, 658 (quoting Branstetter v. Purohit, 06-1435, p. 4 (La.App. 4 Cir. 5/2/07), 958 So.2d 740, 743). Pursuant to the Domestic Abuse Assistance Law, “[u]pon good cause shown [which is defined as immediate and present danger of abuse] in an ex parte proceeding, the court may enter a temporary restraining order, without bond, as it deems necessary to protect from abuse the petitioner [or] any minor children.” La. R.S. 46:2135(A). “Domestic abuse” is defined as including, but not limited to, “physical or sexual abuse ... committed by one family or household member against another.” La. R.S. 46:2132(3). The pertinent provision of the Domestic Abuse Assistance Law that applies here is La. R.S. 46:2135(B), which provides:
If a temporary restraining order is granted without notice, the matter shall be set within twenty-one days for a rule to show cause why the protective order should not be issued, at which time the petitioner must prove the allegations of abuse by a preponderance of the evidence.
A trial court’s decision denying a protective order under La. R.S. 46:2135 is reversible only upon a showing of an abuse of discretion. Okechukwu v. Okechukwu, 13-1421, p. 3 (La.App. 3 Cir. 5/21/14), 139 So.3d 1135, 1138 (citing Mitchell v. Marshall, 02-15 (La.App. 3 Cir. 5/1/02), 819 So.2d359); see also Rouyea v. Rouyea, 00-2613, p. 5 (La.App. 1 Cir. 3/28/01), 808 So.2d 558, 561. Moreover, “the trial court sitting as a trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error.” Ruiz v. Ruiz, 05-175, p. 4 (La.App. 5 Cir. 7/26/05), 910 So.2d 443, 445.
In its judgment, the trial court failed to address the motion for protective order, which the parties and the court agreed would be tried together with the custody matter. Given the silence of the judgment, the motion for a protective order is deemed denied.[17] The trial court, however, addressed the issue of alleged *806 sexual abuse in its reasons for judgment, stating as follows: “[ajllegations were made of inappropriate contact made to the minor by petitioner’s new husband, referred to as KS, in a Rule for Exparte [sic] Custody. In the hearing, Defendant-in-rule, Brett Cooper, was not able to demonstrate to this court that the allegations had merit.” On appeal, the narrow issue is thus whether the trial court abused its discretion in finding Mr. Cooper failed to prove the allegations of sexual abuse by a preponderance of the evidence as required by La. R.S. 46:2135(B).
Mr. Cooper’s testimony at trial regarding the allegations of sexual abuse tracked the averments he made in his August 1, 2013, rule for ex parte custody, quoted earlier in this opinion. According to Mr. Cooper, the allegations of sexual abuse originated at the child’s initial, July 19, 2013, counseling visit at Abundant 11sHealth.[18] At that visit, Mr. Cooper testified that the counselor, after speaking with A.C., related to him that there were “red flags” of sexual abuse — the child’s bed wetting, nightmares, fear of going to her mother’s house, and fear of Mr. Serigne. Mr. Cooper testified that the Abundant Health counselor informed him that she was obligated to contact DCFS and instructed him to have the child examined by a pediatrician. Mr. Cooper testified that he telephoned Dr. Kristy Moody, a female pediatrician, and spoke with her staff. According to Mr. Cooper, Dr. Moody’s staff informed him that Dr. Moody’s instructions were to bring A.C. to Children’s Hospital.[19]
On the afternoon of July 19, 2013, Mr. Cooper testified that he and his wife took A.C. to Children’s Hospital Emergency Room.[20] Although the physical examination was normal, A.C. was referred to the Care Center for a forensic examination.[21] On July 30, 2013, Gina Cooper took A.C. to the Care Center for the [ mforensic medical exam, which was performed that day. The interviewer’s assessment regarding the forensic medical exam reads as follows:
[A.C.] was seen today due to concerns for sexual abuse. She provided a history of not feeling safe at mom’s (reported drinking beer/being ignored/exposure to French kissing between mom and Kendall/new husband). [A.C.] provided a history of sleeping in bed with mom and new husband and that Kendall places his hand below her belly button and it feels “not good.” He wraps his leg around her mom and across her legs.
The assessment states that a picture was drawn of the sleeping arrangement, which *807 requires a “home/environmental assessment in light of behavioral issues.” The forensic medical exam, however, was normal.
According to Mr. Cooper, on August 2, 2018 (the day after the trial court denied Mr. Cooper’s ex parte motion for custody), he asked A.C. to demonstrate the sleeping arrangement at her mother’s house. In so doing, A.C. put Mr. Cooper’s hand underneath her belly button; at that point, Mr. Cooper left the room. Shortly thereafter, A.C. disclosed to Gina Cooper that Mr. Serigne “puts his hand on top of her vagina — her tutu, as she calls it, and pushes down, and it hurts.” Mr. Cooper testified that A.C. repeated that statement to him. In response, he reported the child’s additional disclosure to child services. The case worker came to their house that day and spoke with A.C., who repeated the statement to the case worker. The case worker then called the St. Bernard Police Department. At that point, Detective Ga-rofalo, with the St. Bernard Parish Sheriff’s Office Juvenile Criminal Investigation Bureau, was assigned to investigate this matter.
According to Detective Garofalo, he first met with Mr. Cooper on Monday, August 5, 2013. Mr. Cooper informed him that his daughter had made some 117statements to a counselor that were highly concerning and that he believed his daughter had been sexually abused while in the custody of her mother and her mother’s new husband. Detective Garofalo advised Mr. Cooper that a forensic interview at the Care Center would have to be scheduled. Mr. Cooper advised Detective Garofalo that A.C. previously had been seen at the Care Center on July 30, 2013, and earlier that month at the Children’s Hospital emergency room.
On August 8, 2013, A.C. attended the forensic interview; the child was brought to the Care Center by her stepmother, Gina Cooper. Describing the forensic interview, Detective Garofalo explained that he watched the interview in an adjacent room from which he could hear what was being said; and he had a microphone to communicate with the interviewer. He testified that the child’s principal statement during the forensic interview was as follows:[22]
The child made some statements that she had been sleeping in the mother’s bed. Apparently, it’s a co-sleeping arrangement whenever she stays with her mother. The [stepjfather lays on one side of the bed; the mother lays in the middle, and the child is on the other end of the bed. And the child stated that on more than one occasion, the stepfather would reach across the mother and place his hand or his pinkie finger at the top of her tutu, which she described as her vaginal area, and it felt not good.
When asked whether the child made any allegation regarding her vaginal area other than the above statement, Detective Garo-falo answered in the negative.
Based on his review of the records from the child’s earlier visit to the Care Center, Detective Garofalo testified that what the child stated in the forensic interview on August 8, 2013, was not different than what she earlier stated in the lismedical examination. He explained that “it’s more lacking, her medical interview. Whereas, her forensic interview was more detailed. She wasn’t as specific in her medical interview as she was in her forensic.” Detective Garofalo indicated that the child *808 appeared to be answering the questions freely and to be describing the things that she remembered. He added that the child neither said when the events occurred nor gave a time frame. He, however, noted that “it’s not unusual for a child to be unfamiliar with time frame.” He further noted that an open criminal investigation was still pending, but no arrest was immediately pending. As to the DCFS’s investigation, he stated that he had not spoken to the case worker recently regarding the case. He acknowledged that Mr. Cooper informed him there were some child custody issues pending. As to whether he spoke with Mr. Cooper about obtaining a protective order, Detective Ga-rofalo testified that “[i]n all cases of parents who come into my office, we normally advise the family to protect the child.” He explained that his office generally refers the family to an attorney and tells the family to do what is in the child’s best interest.
On cross-examination, Detective Garo-falo agreed that a six-year old child is “suggestive” — meaning if you tell her things to say, she may say it and actually believe it. Based on the totality of the facts, he testified that he had not requested a warrant for Mr. Serigne’s arrest because he did not feel at that point that there was probable cause to arrest him. On redirect, he acknowledged that that did not mean a warrant would not issue in the future, depending on how the case progresses.
The only other evidence Mr. Cooper presented on the issue of sexual abuse was the testimony of his mother, Sharon Cooper.[23] Sharon Cooper testified that she | Ulwas very close to A.C. and that she would often take care of A.C. On one occasion when she was taking care of A.C. and giving her a tub bath, A.C. disclosed to her that Mr. Serigne had touched her stomach. Sharon Cooper explained that A.C. told her that she and Ms. Alfonso were lying on the bed with Mr. Serigne and that he put his hands on her stomach. A.C. also told Sharon Cooper that she had told her mother that Mr. Serigne touched her and that her mother’s response was to fuss at her and to tell her that she “don’t need to say stuff like that.” Sharon Cooper testified that she instructed A.C. to tell her father. Sharon Cooper further testified that the only person she told about A.C.’s disclosure was her neighbor. She acknowledged that she told neither Mr. Cooper nor Ms. Alfonso about the child’s disclosure. She also acknowledged that she did not call the police and that she probably should have reported the child’s disclosure to OCS (DCFS).
At trial, both Ms. Alfonso and Mr. Se-rigne denied the allegations of sexual abuse. Although Ms. Alfonso acknowledged that she and A.C. had slept at Mr. Serigne’s house a couple of times, she testified that he worked nights. She further testified that when he came home in the morning, he would sleep on the couch. When asked about the child’s statements and the picture that was drawn at the Care Center of the bed sharing arrangement, she testified that they were untrue. She added that Mr. Cooper had made similar allegations regarding her allowing two prior boyfriends (before Mr. Serigne) to sleep in the bed with A.C.[24] She testified *809 12nthat there was not any chance that Mr. Serigne could have sexually molested A.C. and that she would never allow that to happen.
Mr. Serigne corroborated Ms. Alfonso’s testimony that he worked nights and that the allegations regarding the bed sharing arrangement were untrue.[25] He testified that A.C. was making up the bed sharing arrangement thing; he denied ever sharing a bed with his wife and A.C. He also denied ever disciplining, punishing, sexually molesting, or abusing A.C.[26] He testified that he would never abuse A.C. in any way and that being accused of doing so made him disgusted.
As noted, Mr. Cooper had the burden of establishing the allegations of sexual abuse by a preponderance of the evidence. In addressing the issue of whether Mr. Cooper met his burden of proof, Detective Garofalo’s testimony is especially pertinent. Detective Garofalo confirmed that A.C.’s statements in the August 8, 2018, forensic interview were not substantively different from her earlier statements in the July 30, 2013, forensic medical examination. He further |21 confirmed that A.C. did not ascribe any time frame to the alleged incidents. As noted, Mr. Cooper’s mother, Sharon Cooper, likewise did not ascribe any time frame to the child’s disclosure to her. Moreover, Sharon Cooper acknowledged failing to report the child’s disclosure to anyone other than her neighbor. Finally, contrary to Mr. Cooper’s suggestion, Detective Garofalo did not instruct him to file a petition for a protective order. Based on the evidence introduced at trial, we find no abuse of discretion in the trial court’s decision denying Mr. Cooper’s motion for a protective order on behalf of the minor child.
(ii) Domiciliary parent designation
The other issue presented is whether the trial court abused its discretion in awarding joint custody and designating the mother, Ms. Alfonso, as domiciliary parent. Mr. Cooper contends that the trial court abused its discretion as there *810 was no reasonable factual basis for appointing Ms. Alfonso as the domiciliary parent. He further contends that the trial court failed to balance and weigh the appropriate factors for determining the best interest of the child enumerated in La. C.C. art. 134.[27]
LJn child custody cases,[28] the following principles are well-settled:
• Appellate courts will not disturb a trial court’s custody award absent a manifest abuse of discretion.
• “[E]ach child custody case must be viewed in light of its own particular set of facts and circumstances, with the paramount goal of reaching a decision that is in the best interest of the child.”
• In determining the best interest of the child, “[e]ach case must be viewed in light of the child’s age, the situation of the parents, and any other factor relevant to the particular case.”
• To aid courts in making this factual determination, La. C.C. art. 134 enumerates twelve factors for the court to consider. These factors have been construed to be nonexclusive, and the trial court has the discretion to determine the relative amount of weight to be given each factor. The court is not required to analyze mechanically all of the dozen factors; rather the court should balance and weigh the factors in view of the evidence presented.
• The best interest of the child standard — codified in La. C.C. arts. 131 and 134 — is “a fact-intensive inquiry requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented in each case.”
• “Because the trial judge is in the best position to ascertain the best interest of the child based on the particular circumstances of the particular case, the trial court’s custody determination is entitled to great weight and will not be disturbed by an appellate court absent a clear showing of abuse of discretion.”
Hanks v. Hanks, 13-1442, pp. 8-9 (La.App. 4 Cir. 4/16/14), 140 So.3d 208, 215 (internal citations omitted).
*811 On appeal, Mr. Cooper does not contest the joint custody award; rather, he contests the designation of Ms. Alfonso as domiciliary party — “the parent with | gjwhom the child shall primarily reside,” and who has “authority to make all decisions affecting the child unless an implementation order provides otherwise.” La. R.S. 9:335(B). The narrow issue presented is thus whether the trial court erred in determining that it was in the best interest of the child that Ms. Alfonso be designated as domiciliary parent.[29] In addressing this issue, we do so by applying the dozen La. C.C. art. 134 factors to the facts of this case. For ease of discussion, we review the factors in reverse order.
Factor 12 — the responsibility for the care and rearing of the child, previously exercised by each party
As noted, the parties lived together for the first five years of A.C.’s life. During those five years,[30] Ms. Alfonso characterized herself as A.C.’s primary caretaker— the person who was mainly responsible for obtaining medical and dental treatment for A.C., feeding her, bathing her, dressing her, and putting her to bed. She, however, acknowledged that Mr. Cooper had some involvement in caring for the child. Mr. Cooper testified that it was only partially true that Ms. Alfonso was A.C.’s primary caretaker during those five years. He explained that he worked to provide financially for his child and that he also assisted in performing the actual day-today duties of raising A.C. — bathing, feeding, putting her to sleep, and getting up in the middle of the night with her. Mr. Cooper, however, acknowledged that Ms. Alfonso stayed at home with A.C. for the first year of her life. When Ms. Alfonso returned to work, A.C. went to daycare. Ms. Alfonso testified that Mr. Cooper assisted in bringing and picking up A.C. from daycare; 124however, she testified that she was the primary one that did so. Mr. Cooper, on the other hand, testified that both parties brought and picked up A.C. from day care fifty percent of the time.
Initially after the parties separated, A.C. resided primarily with Ms. Alfonso; Mr. Cooper had physical custody every other weekend. The parties dispute how long the initial arrangement lasted. Mr. Cooper estimated that it was only a month, if that long; Ms. Alfonso maintained that it lasted until July 2012 when Mr. Cooper started dating his current wife, Gina Cooper.[31] At that point, Ms. Alfonso testified that everything changed — Mr. Cooper stopped paying her child support, which until that time he had been paying her, and demanded equal sharing of custody. Regardless, as noted earlier, it is undisputed that, in July 2012, the parties entered into the Agreement, which provided for equal sharing of custody and for Ms. Alfonso to be domiciliary parent.
While A.C. was still enrolled in school in St. Bernard Parish, Mr. Cooper acknowledged that he refused Ms. Alfonso’s request to allow A.C. to go to her maternal grandmother’s house after school on the weeks that he had custody. Instead, he took the child with him to the tire shop where he worked. According to Ms. Alfonso, when A.C. was at Mr. Cooper’s *812 work, she either waited in his vehicle or played in and around the tire shop. Mr. Cooper, on the other hand, testified that A.C. sat in an office at the tire shop and that she was properly supervised by his boss. He further testified that A.C. liked this arrangement. During this same period, Mr. Cooper testified that he paid the expenses for A.C. to participate in soccer. He | ^further testified that both he and Gina Cooper attended all of A.C.’s soccer games, but Ms. Alfonso failed to do so.
From July 2012 through the trial date (September 2013), the record reflects that, on the weeks that Mr. Cooper had custody, it was Gina Cooper, not Mr. Cooper, who primarily took A.C. to medical and dental appointments. Indeed, while Mr. Cooper testified that both he and Gina Cooper took A.C. to Children’s Hospital emergency room on July 19, 2013;[32] he acknowledged that only Gina Cooper took A.C. to the Care Center for the July 30, 2013, forensic medical examination and the August 8, 2013, forensic interview. Given all the evidence presented, we find this factor weighs in Ms. Alfonso’s favor.
Factor 11 — the distance between the respective residences of the parties
When the parties initially separated, they both were living in St. Bernard Parish; the distance between them was not a factor. Mr. Cooper’s move to Slidell rendered the original visitation schedule set forth in the Agreement impractical because of the distance between St. Bernard Parish and Slidell. The parties thus agreed to change to a week-to-week visitation schedule.[33]
According to Ms. Alfonso, the distance between the parties caused problems. As an example, she pointed out that Mr. Cooper would wake A.C. up | yearly in Slidell, take her with him to drive Gina Cooper to work in New Orleans,[34] and then take A.C. to school in St. Bernard. The problem this created, according to Ms. Alfonso, was that, as a result of having to wake up so early, A.C. was tired. Mr. Cooper acknowledged they would leave their house in Slidell at 6:30 a.m.; however, he emphasized that he always had A.C. to school in St. Bernard Parish on time. He also emphasized that he and his wife attended all of A.C.’s soccer games in St. Bernard Parish. He thus contends that the trial court erred in finding the distance between the parties a factor that weighed in Ms. Alfonso’s favor.
What the trial court found, in its reasons for judgment, regarding this factor was that Mr. Cooper used the distance — his move to Slidell — to preclude visitation between Ms. Alfonso and A.C. The record supports this finding. See Masters v. Masters, 35,477, p. 7 (La.App. 2 Cir. 10/2/01), 795 So.2d 1271, 1277 (finding distance weighed in favor of father given that “[mother’s] move to Slidell rendered the original custody plan impractical because of the distance between Ouachita Parish *813 and Slidell, and she used that distance to further deny [father] his court-ordered visitation and telephone contact.”) In this case, Mr. Cooper used his domicile in St. Tammany Parish (Slidell) to obtain a temporary custody order in that parish, after having been denied one less than a week earlier in St. Bernard Parish. After obtaining that temporary custody order, he removed the child from her school in St. Bernard Parish and enrolled her in school in Slidell, despite the 127trial court’s order and instruction not to move the child from school in St. Bernard Parish until the trial. He also enrolled the child in extracurricular activities in Slidell. Agreeing with the trial court, we find this factor weighs in Ms. Alfonso’s favor.
Factor 10 — the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party
Ms. Alfonso testified that she was willing to promote a relationship between A.C. and Mr. Cooper. Indeed, she points out that she lived with Mr. Cooper’s parents after the parties separated.[35] She thus contends that she has established her willingness to promote a close and continuing relationship between the child and not only Mr. Cooper, but also his family. She, however, testified that she did not know if Mr. Cooper was willing to promote a relationship between A.C. and her. She testified that he had not done so during the forty-three day period before trial.
Mr. Cooper testified that during the forty-three day period before trial he offered visitation to Ms. Alfonso, but she refused his offer. He acknowledged that his offer was for her to visit the child at his parents’ house while he was at work. During this time, Mr. Cooper emphasized that Gina Cooper invited Ms. Alfonso to participate in A.C.’s extracurricular (cheerleading) activities in Slidell, but Ms. Alfonso refused. Gina Cooper explained that she did so because she did not want A.C. not to see her mother.
We find the record establishes Mr. Cooper’s unwillingness to facilitate and encourage a close and continuing relationship between A.C. and Ms. Alfonso. In the parties’ Agreement, Mr. Cooper agreed to keep Ms. Alfonso “advised as to any | ^serious illness or other major developments with respect to the child.” He has failed to do so. He has failed to communicate with Ms. Alfonso regarding the child’s medical and dental treatment, her school placement, and the allegations of sexual abuse. Indeed, Mr. Cooper admitted that the primary communication between him and Ms. Alfonso since they separated has been through his wife, Gina Cooper.[36] Mr. Cooper also admitted that he has withheld A.C. from Ms. Alfonso on multiple occasions. Moreover, as the trial court found, Mr. Cooper has made allegations, which he failed to substantiate at trial, of sexual abuse of A.C. by Ms. Alfonso’s husband. *814 See Dunklin v. Dunklin, 46,885, p. 9 (La.App. 2 Cir. 2/29/12), 86 So.3d 741, 746 (noting that “the trial court implicitly found that defendant’s unfounded allegation of child abuse by plaintiff indicated defendant’s unwillingness to encourage a close relationship between the children and plaintiff.”) We thus find that this factor weighs in Ms. Alfonso’s favor.
Factor 9 — the reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference
Given A.C. was only six years old at the time of trial, this factor is inapposite.
Factor 8 — the home, school, and community history of the child
The child’s home, school, and community history was one of the primary La. C.C. art. 134 factors that the trial court expressly considered in its reasons for judgment. As the trial court stated, “[djespite a court order issued February 22, | g92013, prohibiting Brett Cooper from removing the minor child from her school, he has done just that.” Moreover, the trial court concluded that “[flor the last two years, the child was attending school in St. Bernard Parish and, according to the testimony, was well adjusted and happy. The court determines that the child’s best interests dictate she remain in school in St. Bernard.” The trial court’s findings on this factor are supported by Ms. Alfonso’s testimony that A.C. attended pre-K and kindergarten at Gauthier Elementary in St. Bernard Parish; that A.C. has plenty of friends and cousins that attended her school in St. Bernard; and that A.C. was excited about her teacher and starting first grade there. See Silbernagel v. Silbernagel, 10-267, p. 11 (La.App. 5 Cir. 5/10/11), 65 So.3d 724, 730 (noting that “ ‘a child’s successful continuation of his or her education in a proven academic environment is generally found to be in his or her best interest’ ” and finding no error in the trial court’s ruling ordering the child to remain at the school where the child was “thriving”).
Contrary to the trial court’s order and its instruction to the parties that the child continue in her school in St. Bernard until the trial in this matter, in August 2013, Mr. Cooper removed the child from her school and enrolled the child in school in Slidell. He did so immediately after he obtained an order of temporary custody from the St. Tammany court. Thus, at the time of the custody trial, September 2013, A.C. was attending first grade at Cypress Cove Elementary in Slidell (St. Tammany Parish) instead of Gauthier Elementary in St. Bernard Parish. Mr. Cooper also testified that he enrolled A.C. in various extracurricular activities in Slidell, including cheerleading and hip-hop dancing.
Although Mr. Cooper denied planning to move A.C. to school in Slidell, A.C. told the interviewer, in the July 30, 2013, forensic medical examination, that | snshe was going to school in Slidell. When questioned regarding this issue, Mr. Cooper denied telling A.C. that she was going to school in Slidell; rather, he explained that A.C. told him that she hated Gauthier Elementary and that she did not like her teacher at that school. In response, he told A.C. that they could talk to her mother and ask whether her mother would allow her to go to school in Slidell.
At trial, Mr. Cooper admitted he was aware that the trial court had instructed the parties’ attorneys at the August 1, 2013, status conference that A.C. was to continue going to school at Gauthier Elementary until the trial. Nonetheless, Mr. Cooper denied violating a trial court “order” by moving A.C. to school in Slidell. In response to the question of whether he moved the child “[djespite the fact that Judge Klees [the trial judgej said to keep her at Gauthier [Elementary],” he replied *815 that the court “[s]aid to keep, not Court ordered.” Mr. Cooper further testified that he was not going “over the Judge’s head” by moving A.C. to school in Slidell given that “[A.C.] has claimed to be touched after that date [the date of the August 1, 2013 status conference].”
Mr. Cooper’s attempt to justify his actions on the basis that A.C. claimed that she was touched by Mr. Serigne after August 1, 2013, the date of the status conference, is not supported by the record. Detective Garofalo testified that A.C.’s testimony at the August 8, 2013, forensic interview was not different than what she earlier testified to in the July 30, 2013, forensic medical examination. A.C. placed no time frame regarding when the alleged incidents of sexual abuse occurred. Regardless, Mr. Cooper’s disregard of the trial court’s express order and its instructions is inexcusable. Hence, we find no error in the trial court’s implicit finding that this factor weighs in Ms. Alfonso’s favor.
Factor 7 — the mental and physical health of each party
[s,No mental or physical health problem of either party was established at trial.[37] The parties are on equal footing on this factor.
Factor 6 — the moral fitness of each party, insofar as it affects the welfare of the child
This factor “reflects the jurisprudential rule that moral misconduct should be considered only if it has a detrimental effect on the child, not to regulate the moral behavior of the parents.” Griffith v. Latiolais, 10-0754, p. 18 (La.10/19/10), 48 So.3d 1058, 1071. Mr. Cooper emphasized the fact that Ms. Alfonso has had multiple relationships with other men since their separation and that she has exposed A.C. to her multiple romantic relationships. He notes that Ms. Alfonso has had the child in her bedroom with different men on different occasions. He also notes that Ms. Alfonso has engaged in morally questionable behavior with her new husband that has made the child clearly uncomfortable — French kissing and allowing her husband to get into the shower with her when the minor child was aware of what was happening.
Both Mr. Cooper and his mother testified that A.C. has told them that she has slept in the same bedroom with her mother’s boyfriends. Mr. Cooper testified that A.C. has told him that her mother made her sleep in the bed with not only Mr. Serigne, but also multiple other men. He testified A.C. has told him “[t]hat her mother makes her sleep in the bed with these other men that [A.C.] don’t have a choice.” Sharon Cooper also testified that A.C. has told her that her mother has made her sleep on the floor while other men were in the bed with her mother.[38]
| S2Ms. Alfonso, on the other hand, accuses Mr. Cooper and his wife, Gina Cooper, and his mother, Sharon Cooper, of fabricating the sexual abuse claim against her husband, Mr. Serigne, in order to obtain temporary and then permanent custody of *816 A.C.[39] Ms. Alfonso also points out that Mr. Cooper has engaged in “self-help” on multiple occasions[40] and that he has disregarded the orders and instructions of the court by removing the child from her school in St. Bernard Parish.
In this case, issues have been identified regarding allegedly immoral behavior of both parties that arguably affect the welfare of the child. These issues regarding the parties’ moral fitness go to the parties’ credibility, which the trial court was allowed to weigh. In so doing, the trial court was allowed to consider not only the cited incidents, but also the parties’ overall trial testimony. See McCready v. McCready, 41,026, p. 9 (La.App. 2 Cir. 3/8/06), 924 So.2d 471, 476 (reasoning that the father’s claims regarding incidents he cited to establish the mother’s immoral behavior “go to credibility which the trial court could weigh not only from the cited incidents but from [the mother’s] overall testimony.”) On this factor, we find the parties are on equal footing.
| ^Factor 5 — the permanence, as a family unit, of the existing or proposed custodial home or homes
This factor disfavors a parent who, since the parties separated, has had multiple addresses, multiple romantic relationships, or both. Ms. Alfonso falls into both categories. At trial, Ms. Alfonso acknowledged that since the parties separated she has had five different addresses and multiple romantic relationships. In contrast, since November 2012, Mr. Cooper has lived in the same rental house in Slidell. His only romantic relationship since he and Ms. Alfonso separated was with Gina Cooper. In March 2013, they had a child together; in July 2013, they were married. We find this factor weighs in Mr. Cooper’s favor.
Factor J — the length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment
A major issue at trial was the stability, or lack thereof, of the parties’ home environments. As noted above, Ms. Alfonso has moved at least five times since the parties separated. At the time of trial, an OCS safety plan was in effect. Under the safety plan, when Ms. Alfonso has A.C., she is required to stay at her mother’s house. During the forty-three days before trial, however, Mr. Cooper withheld A.C. from Ms. Alfonso. Because she did not have A.C. during this time, Ms. Alfonso testified that she stayed with her husband. She further testified that if she is awarded custody, she plans to live with her mother until the investigation is completed. She still further testified that her mother’s house is located about three minutes from Gauthier Elementary, where she plans to re-enroll A.C. in school. As noted, Gauthier Elementary is where A.C. attended pre-K and kindergarten and where she was supposed to attend first grade.
_Jj|Mr. Cooper, in contrast, testified that he is currently living in a four-bedroom, two-story house in Slidell. He lives there with his wife, Gina Cooper; their infant (five-month-old) child; his two stepchildren (a ten-year-old girl and a seven-year-old boy, who are Ms. Cooper’s children *817 from a prior marriage); and A.C. At trial, Mr. Cooper described in detail the sleeping arrangements at his Slidell house.[41] Mr. Cooper testified that when A.C. is at his house, she sleeps in her own bedroom at night. He further testified that A.C. plays well together with his two stepchildren. At the time of trial, A.C. was enrolled in school and extracurricular activities in Slidell. According to Mr. Cooper, his wife (Gina Cooper), and his mother (Sharon Cooper), Mr. Cooper has the more stable home.[42] We find this factor weighs in Mr. Cooper’s favor.
Factor 3 — the capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs
Both Ms. Alfonso and Mr. Cooper requested child support in their petitions. At the time of trial, however, Mr. Cooper was the only parent who was employed. I^As Mr. Cooper emphasized, Ms. Alfonso was unemployed, without a vehicle for transportation, and relying on others to provide for her own needs. Ms. Alfonso countered that although she was unemployed, she was fully capable of obtaining employment and that she has been employed in the past. Her past jobs included working for St. Bernard Parish Government and Wal-Mart. She pointed out that “at the time of the trial her husband had a good job, which allowed her to be home with [A.C.] when she was out of school.” She further pointed out that Mr. Cooper’s payment of child support would alleviate this problem and increase her ability to meet A.C.’s physical needs. Mr. Cooper, on the other hand, testified that he was employed as a tire technician in St. Bernard Parish and that he had been employed there for over three years.
We find this factor weighs in Mr. Cooper’s favor for two reasons. First, at the time of trial, he was the only parent who was employed. Second, he took the initiative to bring A.C. to counseling for her anxiety. See Moss v. Goodger, 12-783, p. 11 (La.App. 3 Cir. 12/12/12), 104 So.3d 807, 814 (finding a parent’s initiative in bringing a child to counseling relevant to La. C.C. art. 134(3) and noting that “[t]he trial court also referenced Mr. Goodger’s initiative in bringing Hoyt to counseling in weighing that factor in Mr. Goodger’s favor.”). Given Mr. Cooper’s actions in obtaining counseling for A.C. coupled with *818 his status as the only employed parent, this factor weighs in his favor.
Factor 2 — the capacity and, disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child,
Both parents indicated their love for A.C. No evidence was presented that either is better suited to give the child love, affection, spiritual guidance, or to |Sficontinue with the rearing and education of the minor child. The parties are on equal footing on this factor.
Factor 1 — the love, affection, and other emotional ties between each party and the child
As the trial court found, both parents have “deep love and sincere interest in the minor child.” At trial, Ms. Alfonso denied the suggestion that she ever ignored her daughter. On this factor, the parties are on equal footing.
Summarizing, four of the La. C.C. art. 134 factors favor Ms. Alfonso, three of the factors favor Mr. Cooper, three of the factors equally favor both parties, and one of the factors is inapplicable. As noted earlier, “the trial court has the discretion to determine the relative amount of weight to be given each factor. The court is not required to analyze mechanically all of the dozen factors; rather the court should balance and weigh the factors in view of the evidence presented.” Hanks, 13-1442 at p. 9, 140 So.3d at 215. Moreover, the factors are illustrative, not exclusive. Id.; La. C.C. art. 134 (providing that “[t]he court shall consider all relevant factors in determining the best interest of the child”). The trial court is thus entitled to consider in its best interest determination any other relevant factor. In this case, another relevant factor that the trial court was entitled to consider was Mr. Cooper’s disregard of its instructions and its order not to move A.C. from her school in St. Bernard Parish pending the trial in this matter. See Pizzolato v. Hihar; 02-53, p. 8 (La.App. 5 Cir. 6/26/02), 822 So.2d 835, 840 (noting that “the court also gave weight to its conclusion that Hihar [the mother] had disregarded its order not to allow her fiancee to have any contact with A.P. [the child].”) After weighing and balancing the dozen factors and the other relevant factors, the trial court |S7concluded, and we agree, that it was in A.C.’s best interest for the parties to be granted joint custody, with Ms. Alfonso named as domiciliary parent.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.

. In this opinion, the initials of the minor child are used to protect and maintain the privacy of the minor child involved in this proceeding. See Uniform Rules, Courts of Appeal, Rule 5-1 and Rule 5-2.

. At trial, Mr. Cooper's mother, Sharon Cooper, testified that she drafted and had the parties execute the Agreement in an attempt to resolve the dispute between the parties regarding the visitation schedule. Although Ms. Alfonso testified that she was coerced into signing the Agreement, both Sharon Cooper and Mr. Cooper denied any coercion. To the contrary, Sharon Cooper explained that the initial version of the Agreement was modified to meet Ms. Alfonso's demand that the amount of child support be increased from $200 to $250. Mr. Cooper, however, acknowledged that at the time the Agreement was signed he had withheld A.C. from Ms. Alfonso for a week. He explained that he did so because he wanted more time with his child, but Ms. Alfonso would not agree. Although the Agreement provided for Mr. Cooper to pay $250 per month in child support, he acknowledged that he only made one payment.

.Mr. Cooper denied in his answer to Ms. Alfonso's petition ever withholding A.C. from Ms. Alfonso; however, at trial he admitted doing so.

. Although Ms. Alfonso made no allegations in her petition that Mr. Cooper had abused her, she testified at trial that he was physically abusive to her during their relationship and that some incidents of the abuse occurred in A.C.'s presence.

. At trial, Ms. Alfonso acknowledged that she had lived in at least five different locations since the parties separated. Those locations included her brother’s house, her mother’s house, Mr. Cooper's parents' house, a trailer park, and the rental property the parties were living in when they separated. She explained that she was evicted from the trailer park because she had a pet. She further explained that the reason she moved from the rental property was because the owner decided to sell the property, and she could not afford to buy it.

. On December 6, 2012, A.C. was first seen for counseling at the Guidance Center. According to the Guidance Center’s records, the “presenting problem” for which the child was seen was as follows:
Recipient’s [A.C.’s] mother and father recently separated at the end of [M]arch 2012 and recipient is being [sic] to act out with signs of anxiety, i.e., she reports feeling chest pains, or that parts of her body are hurting, doesn’t want to go to school, will fight to get on the bus, won't sleep in her bed at mom’s home and will let her sleep with her, so now dad can’t get her to sleep in her own bed, client is having crying and anger fits.... [F]ather is concerned b/c she is hearing negative talk of dad at mom’s house and she repeats this to dad. Also dad has new girlfriend and they have a child on the way.... Father concerned b/c his parents, whom he is estranged with, and his ex are speaking horrible to his daughter about him.... [Dad] called Child Services yesterday b/c he is concerned for when his daughter stays at that home [his parents' home] with her mom, and wants to try to get temporary custody.
On March 4, 2013, A.C. was discharged from the Guidance Center. At least three different reasons were offered as to why A.C. was discharged. First, the Guidance Center *800 records state that Mr. Cooper requested A.C.’s discharge because she was “doing good.” Second, Gina Cooper, at Mr. Cooper’s request, handwrote on the copy of the discharge letter that was introduced at trial that the reason for the child's discharge was due to Ms. Alfonso missing too many appointments on her week with A.C. Third, in July 2013, when Mr. Cooper began taking A.C. to counseling at a different place, Abundant Health, Inc., the reason he gave for discontinuing taking A.C. to counseling at the Guidance Center was that he did not like the way they handled the situation. At trial, Mr. Cooper testified that all three reasons were correct.

. At trial, Mr. Cooper acknowledged that in April 2013 he went to Ms. Alfonso's place of employment, Wal-Mart, and had the vehicle towed from the parking lot without telling her. His explanation for his actions was that he and Ms. Alfonso co-owned the vehicle, that he was the only party on the mortgage, and that Ms. Alfonso was late in making the mortgage payments. He testified that "it was better served for me [him] to get up to date on the payments and get rid of the vehicle.” Although the vehicle was returned to Ms. Alfonso, she testified that her personal belongings that were in the vehicle when it was towed were never returned to her. In June 2013, a second incident occurred involving the vehicle. On this occasion, Mr. Cooper allowed his wife, Gina Cooper, to phone and text Ms. Alfonso repeatedly over a two-day period regarding the vehicle. A copy of the threatening text messages that Gina Cooper acknowledged she sent to Ms. Alfonso during that period was introduced into evidence.

. Mr. Serigne’s first name is spelled two different ways in the record: "Kendall” and "Kendal.” For purposes of this opinion, we use the spelling set forth in the trial transcript, which is "Kendal.”

. At trial, Mr. Cooper testified that he did not call Ms. Alfonso about the sexual abuse allegation. He explained that he had previously called her regarding her boyfriends and requested that she keep A.C. out of the bed with other men, yet she continued to do so.

.Mr. Cooper acknowledged that Patrice Allen was not the name of the counselor that A.C. saw at Abundant Health.

. According to Ms. Alfonso’s counsel, a consent judgment containing this agreement was prepared by him and sent to Mr. Cooper's counsel on August 5, 2013.

. In his pleading, Mr. Cooper also listed under "past incidents” that in May 2013 and June 2013 the minor child was brought back home with severe sunburn all over her body and photographs were taken. At trial, those *803 photographs were introduced into evidence. Ms. Alfonso denied the suggestion that the child was badly sunburned while in her custody. She testified that she always applied suntan lotion on the child.

. Indeed, the standard "Petition for Protection from Abuse” form that Mr. Cooper used included the following question: "[whether t]here is a suit for custody involving children named in this petition." He failed to check the blank in front of that question or to fill out the required "Addendum” related to that question.

. According to Mr. Cooper, on August 21, 2013, the St. Tammany court held a hearing and determined that the protective order should be "heard in St. Bernard Parish as that is the Parish where all the witnesses to the alleged incident are located.” After Mr. Cooper obtained a TRO in St. Bernard Parish, he dismissed the proceeding in St. Tammany Parish.

. “OCS” refers to the former Office of Children's Services, which is now known as the Department of Children and Family Services (the "DCFS”). McCaffery v. McCaffery, 13-692, p. 22 (La.App. 5 Cir. 4/9/14), 140 So.3d 105, 109.

. Ms. Alfonso testified that the safety plan provides that, when she has A.C., she is required to stay with her mother and that Mr. Serigne is not allowed to be present. It further provides that if Mr. Serigne is allowed to be present when Ms. Alfonso has A.C., the OCS is to take A.C. from Ms. Alfonso and to return her to Mr. Cooper. Ms. Alfonso testified that she understood the safety plan was a "temporary thing” while the investigation was taking place.

. See Wynn v. Luck, 47,314, p. 8 (La.App. 2 Cir. 9/26/12), 106 So.3d 111, 115 (citing MJ. Farms, Ltd. v. Exxon Mobil Corp., 07-2371 (La.7/1/08), 998 So.2d 16, and noting that “[generally, when a judgment is silent as to a claim or demand, it is presumed that the relief sought was denied.")

. According to Mr. Cooper, the reason he took A.C. to Abundant Health was so that she could talk to someone. He and his wife told the counselor that A.C. was having behavior problems — wetting the bed at her mother's house, having nightmares, and having panic attacks.

. Mr. Cooper acknowledged that he never brought the child to either Dr. Moody or her regular pediatrician before taking her to Children’s Hospital.

.- The Children's Hospital records reflect only Gina Cooper’s presence at the emergency room visit.

.The Abundant Health records mention neither "red flags" nor allegations of sexual abuse. The "Forensic Medical Referral” form, dated July 19, 2013, states as follows: “[rjeferred by Dr. Moody pursuant to ‘red flags for suspicion of sexual molestation’ stemming from answered questionnaire/survey given by child's counselor to whom she was referred for chronic anxiety. Survey administered earlier today. No disclosures/allegations.’' According to the July 22, 2013 entry on the "Social Work Case Report” form in the medical records, on July 19, 2013 the nursing supervisor made a report to the DCFS hotline. The social worker called St. Tammany DCFS and spoke to supervisor who confirmed that the case was not accepted.

. Although there was a videotape of the August 8, 2013, forensic interview, it was not introduced into evidence at trial. Rather, the trial court found Detective Garofalo’s testimony was the "best evidence” of what was said at that interview.

. At trial, Mr. Cooper offered to bring the child to court to testify. This suggestion was ultimately rejected. Mr. Cooper acknowledged that he had no intention of calling the child as a witness at trial. Both Mr. Cooper and the trial court noted that they did not want to traumatize the child by calling her as a witness.

. Ms. Alfonso also testified that A.C. and Mr. Serigne get along great. Mr. Cooper, in contrast, testified that A.C. hates Mr. Serigne, *809 that she tells him Mr. Serigne is mean to her, and that Mr. Serigne always ignores her. A.C. also tells him that Mr. Serigne and her mother are always fondling each other and French kissing in front of her and that she is disgusted by it.

. Before Mr. Serigne took the stand, the trial court admonished him that there were allegations of criminal conduct that had been brought up by Detective Garofalo. The trial court informed Mr. Serigne that he was not required to testify and that, if he testified, he would be subject to cross-examination. Mr. Serigne, nonetheless, agreed to testify. At trial, he testified that he was currently twenty-four years old and that he had never been arrested.

. During the forensic medical examination, A.C. stated that Mr. Serigne backhanded his own son and that he was mean. Mr. Serigne testified that he was living in his parents' house and that he has his four-year-old son from a prior relationship every other weekend. Mr. Serigne acknowledged disciplining his son, but he denied backhanding his son. As to A.C.’s statement that he was mean, he testified that A.C. was happy when she was with them.
A.C. also stated in the forensic medical examination that she had seen Ms. Serigne go into the bathroom while her mother was showering and that she had seen them French kissing. Mr. Serigne admitted that A.C. may have seen him go into the bathroom with her mother. As to A.C.’s statements that there was a lot of kissing between him and Ms. Alfonso, he replied that "that’s my wife. If I want to kiss my wife, I can kiss my wife.”
At trial, photographs of A.C. with Mr. Se-rigne’s pit bull named Diamond, which were allegedly posted on Ms. Alfonso’s Facebook page, were introduced into evidence. Mr. Serigne denied that A.C. told him her father wanted her to stay away from the dog; however, he acknowledged that someone else had told that to him. Mr. Serigne added that Diamond loves children.

. La. C.C. art. 134 provides that ”[t]he court shall consider all relevant factors in determining the best interest of the child” and that ”[s]uch factors may include” the following dozen enumerated factors:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. "In a proceeding in which custody of an illegitimate child formally acknowledged by both parents is sought by both parents, ... custody shall be awarded in accordance with the provisions on custody incident to divorce contained in Title V of this Book.” La. C.C. art. 245.

. The trial court set the issue of physical custody, as well as other issues, for a subsequent hearing. Those other issues are thus not before us on appeal.

. For the majority of those five years, they lived with Mr. Cooper's parents.

. Not long after they started dating, Gina Cooper became pregnant with Mr. Cooper’s child. Their child was born in March 2013; they were married in July 2013.

. Although Mr. Cooper testified he was present at Children’s Hospital emergency room when A.C. was brought there on July 19, 2013, the medical records refer only to Gina Cooper as being present with the child.

. As noted elsewhere, the visitation schedule provided for in the Agreement called for the parties to each have physical custody of A.C. for two days during the week and for alternating weekends from Friday to Sunday. Ms. Alfonso testified that she agreed to the change to a week-to-week schedule because Mr. Cooper was threatening to withhold A.C. from her and to move A.C. to school in Slidell.

.Gina Cooper worked in New Orleans until March 2013 when she had a baby. At the time of trial, she was staying home with the baby, who was about five months old. Mr. Cooper testified that their plans were for Gina Cooper to stay home until the baby was twelve to fifteen months old.

. Mr. Cooper’s mother, Sharon Cooper, testified that after the parties separated, she allowed Ms. Alfonso and A.C. to live with her. She explained that she did so because A.C. wanted to stay at her house, and A.C. wanted her mother to stay with her.

. Gina Cooper explained that the reason she communicated with Ms. Alfonso was because Mr. Cooper and Ms. Alfonso could not communicate with each other without fighting. According to Gina Cooper, she first met Ms. Alfonso on Christmas Eve in 2012. Gina Cooper testified that she and Ms. Alfonso had a "decent relationship until [Ms. Alfonso] got upset about the car [in June 2013], and then she stopped texting or talking.” Thus, from December 2012 until June 2013, Gina Cooper communicated with Ms. Alfonso. According to Gina Cooper, the only subsequent communication she had with Ms. Alfonso was to invite her to attend A.C.’s cheerleading activities in Slidell.

. Although Mr. Cooper informed the counselor at Abundant Health that Ms. Alfonso has mental health issues and uses "substances,” he never made these allegations in this case or presented any evidence to establish those facts.

. Sharon Cooper also testified to an incident that occurred when Ms. Alfonso and A.C. were living with her. According to Sharon Cooper, Ms. Alfonso became very intoxicated and sick one night. Sharon Cooper testified that A.C. witnessed her mother in that intoxicated condition and that it scared the child. Sharon Cooper further testified that on that same night she discovered Ms. Alfonso in bed with another man in her house. Ms. Alfonso denied that this incident occurred.

. Sharon Cooper acknowledged that, in a case that predated this one, the daughter-in-law of one of her neighbors obtained a temporary order of sole custody as a result of making similar allegations that the child was sexually abused by the other party. Ms. Alfonso suggests that Mr. Cooper and his family did the same thing in this case.

. As noted elsewhere, Mr. Cooper acknowledged having the vehicle towed from Wal-Mart without telling Ms. Alfonso. He also acknowledged going to Ms. Alfonso’s residence where she was living without telling her and dismantling and taking a bedroom set. He explained that it was his bedroom set.

. Downstairs Mr. Cooper and his wife sleep in the master bedroom, and their five-month-old child sleeps in her own crib. Upstairs there are three bedrooms; the three older children — A.C. and Mr. Cooper’s two stepchildren — each have their own bedroom. There also is a bathroom upstairs for those three children to share. Mr. Cooper identified photographs, which were introduced into evidence, of A.C.’s closet, her bed with her name on the wall above it, and the upstairs bathroom that she and the two older children share.

. Mr. Cooper testified as follows:
My daughter is in better hands with me. She has been living a stable life for those 43 days that she loves. She has no complaints. She does well in school. She has her own bedroom. She does not have to sleep in the bed with another man. She's not bounced around from home to home to home to home. She has one house and her room and her family. It's a more stable environment. It’s better for the child to be more stable.
Gina Cooper similarly testified that: “[A.C.] is stable. She has a stable home.... [S]he has her own room, and she's involved in many things, and she loves it. She's very good at it.... ” Likewise, Sharon Cooper testified that “Brett [Cooper] has a nice home. Brett has a nice family. He works all the time. Whenever he’s off, he does things with his children. ... [T]hose kids have fun. They are learning_ [A.C.] is as happy as can be. She is just — she’s blossoming. She goes to dancing. She goes to cheering. She goes to tumbling. She's very, very happy.”