| | | |
|---|---|---|
| **ANGELLE FULTON** | * | **NO. 2024-CA-0810** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **ANTOINE FULTON, SR.** | * | |
| | | **FOURTH CIRCUIT** |
| | * | |
| | | **STATE OF LOUISIANA** |

* * * * * * *


APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2023-02419, DIVISION "K"
Honorable Bernadette D'Souza, Judge
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Chief Judge Roland L. Belsome, Judge Rosemary Ledet,
Judge Rachael D. Johnson)


Sharon Dell Williams
LAW OFFICE OF JAMES A. GRAHAM, LLC
701 Loyola Avenue, Suite 403
New Orleans, LA 70113

COUNSEL FOR DEFENDANT/APPELLANT


**AFFIRMED**
**April 17, 2025**

This is a domestic matter involving the issuance of a protective order under the Domestic Abuse Assistance Act, La. R.S. 46:2131-43. Defendant—Antoine Fulton, Sr. ("Mr. Fulton")—appeals the Louisiana Uniform Abuse Prevention Order issued by the trial court on September 19, 2024 (the "Domestic Abuse Order"). The Domestic Abuse Order was issued against Mr. Fulton and in favor of his former wife—Angelle Pollard ("Ms. Pollard")[1]—and the parties' three minor children. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

The parties are the parents of four children: one major child, born in 2005 (Major Child"); and three minor children—Minor One, born in 2006; Minor Two, born in 2007; and Minor Three, born in 2011 (collectively the "Minor Children").[2]

---

[1] Following the parties' divorce, Ms. Pollard resumed use of her maiden name, Pollard.

[2] In this opinion, the minor children's names are not used to protect and maintain their privacy. *See* Uniform Rules, Courts of Appeal, Rules 5-1 and 5-2; *see also D.M.S. v. I.D.S.*, 14-0364, p. 1 n.3 (La. App. 4 Cir. 3/4/15), 225 So.3d 1127, 1130 (observing that "[b]ecause of the sensitive nature presented by the facts of this case and in order to protect the identity of the minors involved, we have chosen to use the initials of the parties ... in lieu of their names, although their names appear in the sealed record."). The children's names all begin with the same letter ("A"); thus, we refer to the minor children as Minors One, Two, and Three. At the time of the hearing, the ages of the four children were 18, 17, 16, and 12.

1

In March 2013, the parties were married. The parties physically separated in May 2021. Two years later, Ms. Pollard filed for divorce, which the trial court granted. A judicial custody order was neither requested by the parties nor rendered by the trial court. By mutual agreement, the parties have shared joint custody, alternating weeks with the Minor Children.[3]

Shortly after the divorce was granted, in August 2023, Mr. Fulton filed a Petition for Protection from Abuse against Ms. Pollard ("Mr. Fulton's Petition"), seeking to restrain her from coming to his house or his place of employment.[4] In his verified petition, Mr. Fulton stated that the alleged abuse was Ms. Pollard coming to his house and his place of employment to start fights. As to specific instances of abuse, Mr. Fulton alleged that on both June 5, 2024, and August 3, 2023, Ms. Pollard came to his house and that, on each occasion, she started a fight.[5]

At the August 13, 2024 hearing on Mr. Fulton's Petition, the trial court characterized the parties' problem as a custody matter and instructed them to file a

---

[3] Mr. Fulton represents in his brief that "the parties had been exercising joint custody of the Minor Children without incident [and] without a Court order by amicable agreement for almost three years."

[4] Because Mr. Fulton used the wrong form (a Petition for Protection from Stalking), the trial court denied his first motion. Mr. Fulton then filed another Petition for Protection from Abuse. According to Mr. Fulton, he filed this motion because of a complaint Ms. Pollard made to his employer against him.

[5] Mr. Fulton failed to indicate the nature of the fights—verbal or physical.

custody petition.[6] For this reason, the trial court dismissed Mr. Fulton's Petition, stating:

> [T]his is an issue about custody, and the issues that are coming up. [sic] Most of what I've heard from Mr. Fulton was all about the children. And y'all don't have custody, and you're both divorced. And you're doing things where it's causing you issues when you keep coming to file a protection order. So I'm going to dismiss this.

Ten days later, Ms. Pollard filed a Petition for Protection from Abuse on behalf of herself and the Minor Children ("Ms. Pollard's Petition"). In her verified petition, Ms. Pollard indicated that all venue factors enumerated on the standard form—marital domicile, household, parties' residence, and alleged abuse—occurred in Orleans Parish.[7] She further indicated—by checking off the printed boxes on the form—that Mr. Fulton had committed the following acts of abuse: slapped her, punched her, choked or strangled her, shoved her, stalked her, threatened her with bodily harm, and threated her with a weapon.[8] In her petition,

---

[6] At the hearing, the following exchange occurred between the trial judge and Mr. Bullard regarding the issue:

> Q. Okay. But do you realize why y'all are having this confrontation because there is no custody in place?
>
> A. So we have—we have a mutual agreement. With that mutual agreement is when I have the kids, that's my time. When she has the kids, it's her time.
>
> Q. But every time it happens regarding the children, you are going to come running to court to file a petition for protection.
>
> A. This is—none of this has to do with the kids. I apologize if you're taking it that way, but this has nothing to do with the kids. It's every time Ms. Pollard comes to my house.
>
> Q. And the kids are not with you?
>
> A. She only comes when the kids are with me, but she has no reason to come.

[7] The petitions for protection from abuse filed by both parties here were made on the "pre-printed form[s] utilized across the entire state of Louisiana." *Vallius v. Vallius*, 10-0870, p. 4 (La. App. 4 Cir. 12/8/10), 53 So. 3d 655, 657. The forms include boxes to check and blanks to complete.

[8] Ms. Pollard wrote in other allegations included "verbal, mental, emotion, and financial."

Ms. Pollard outlined five different occasions on which she alleged that Mr. Fulton had abused her. Two of those occasions coincided with those identified in Mr. Fulton's Petition—June 5, 2024; and August 3, 2023. The other three occasions were June 18, 2023; July 2, 2022; and May 23, 2021.

At the September 19, 2024 hearing on Ms. Pollard's Petition, both parties appeared *pro se*; and both parties testified. The parties were the only witnesses. The trial court swore both of the parties in and questioned both of them regarding the domestic abuse allegations. Mr. Fulton denied all of Ms. Pollard's abuse allegations; conversely; Ms. Pollard confirmed that all of her abuse allegations were true. At the conclusion of the hearing, the trial court found Ms. Pollard met her burden of proof and granted the Domestic Abuse Order. The order—which was in favor of Ms. Pollard and the Minor Children and against Mr. Fulton—included the following terms:

- The duration of the Order of Protection was set for the maximum allowed period of eighteen months—until March 19, 2026;

- Ms. Pollard was granted use of the family residence (the "Residence"); Mr. Fulton was ordered to stay 100 yards away from Ms. Pollard and the Residence;

- Mr. Fulton was ordered to stay away from both Ms. Pollard's place of employment and the Minor Children's schools and not to interfere in any manner with such employment or schools;

- Mr. Fulton was required to attend a batterer intervention program and attend parenting classes at Children's Hospital;

- Ms. Pollard was granted temporary custody of the Minor Children;

- Mr. Fulton was granted supervised visitation of the Minor Children— every other Sunday from 10:00 a.m. to 2:00 p.m. or from 1:00 p.m. to 6:00 p.m. depending on the Minor Children's work schedule;

- Mr. Fulton was required to retain a supervisor—either a therapist or mental health professional—and his supervised visitation was to be

4

coordinated through the supervisor with no contact between Ms. Pollard and Mr. Fulton;[9] and

- Mr. Fulton was notified that he was not allowed to possess firearms.[10]

This appeal by Mr. Fulton followed.[11]

## DISCUSSION

**Governing principles and standard of review**

The governing principles and standard of review regarding Domestic Abuse

Protection Orders are as follows:

- In domestic violence cases, orders of protection are issued pursuant to La. R.S. 46:2131 *et seq.*, the Domestic Abuse Assistance Act. The purpose of the statute is to provide relief to victims of domestic violence by establishing a civil remedy for domestic violence which will afford the victim immediate and easily accessible protection.

- Upon good cause shown, the trial court may enter a temporary restraining order, without bond, as it deems necessary to protect from abuse the petitioner

---

[9] When issuing protective orders under the Domestic Abuse Assistance Law, courts are required to use a uniform form developed, approved and distributed by the Judicial Administrator's Office for the Louisiana Supreme Court. *See* La. R.S. 46:2136.2(C). Here, as indicated on the notation at the bottom of each page of the Domestic Abuse Order, the trial court issued a "LPOR 3" Protective Order, which is the correct form for a domestic abuse protective order. *See S.M. v. T.M.*, 19-369, p. 11 (La. App. 5 Cir. 12/26/19), 289 So.3d 141, 148-49.

[10] La. R.S. 46:2136.3(A) provides:

> Any person against whom the court has issued a permanent injunction or a protective order pursuant to a court-approved consent agreement or pursuant to the provisions of R.S. 9:361 et seq. . . . shall be prohibited from possessing a firearm or carrying a concealed weapon for the duration of the injunction or protective order if both of the following occur:
>
> (1) The permanent injunction or protective order includes a finding that the person subject to the permanent injunction or protective order represents a credible threat to the physical safety of a family member, household member, or dating partner.
>
> (2) The permanent injunction or protective order informs the person subject to the permanent injunction or protective order that the person is prohibited from possessing a firearm pursuant to the provisions of 18 U.S.C. 922(g)(8) and this Section.

[11] La. R.S. 46:2136(F)(1) (providing that "any final protective order or approved consent agreement shall be for a fixed period of time, not to exceed eighteen months, and may be extended by the court, after a contradictory hearing, in its discretion. Such protective order or extension thereof shall be subject to a devolutive appeal only").

or any minor children. La. R.S. 46:2135(A). A showing of "immediate and present danger of abuse" constitutes good cause.

- After a hearing, the trial court may grant a protective order "to bring about a cessation of domestic abuse as defined in [La.] R.S. 46:2132, or the threat or danger thereof, to a party, [or] any minor children." La. R.S. 46:2136(A).

- To obtain a protective order, the petitioner must prove his or her allegations of domestic abuse by a preponderance of the evidence. La. R.S. 46:2135(B).[12] Also, Louisiana jurisprudence has interpreted the "good cause shown" requirement to apply to both temporary restraining orders and to other protective orders.

- "Domestic abuse includes but is not limited to physical or sexual abuse and any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana, except negligent injury and defamation, committed by one family member, household member, or dating partner against another." La. R.S. 46:2132(3). ["Family member" is defined as including former spouses, parents, and children. La. R.S. 46:2132(4).]

- General harassment and family arguments, if they do not rise to the threshold of physical or sexual abuse in violation of the criminal code, or an offense against the person, are not within the ambit of the Domestic Abuse Assistance Act.

- An appellate court reviews domestic protective orders for an abuse of discretion.

*Lassair on Behalf of T.P.J. v. Paul*, 22-0320, pp. 4-6 (La. App. 4 Cir. 12/14/20), 353 So.3d 1048, 1051-53 (reformatted; case citations and quotations omitted). Furthermore, "the trial court sitting as a trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error." *Alfonso v. Cooper*, 14-0145, pp. 13-14 (La. App. 4 Cir. 7/16/14) 146 So.3d 796, 805 (citations omitted).

---

[12] La. R.S. 46:2135(B) provides:

> If a temporary restraining order is granted without notice, the matter shall be set within twenty-one days for a rule to show cause why the protective order should not be issued, at which time the petitioner must prove the allegations of abuse by a preponderance of the evidence. The defendant shall be given notice of the temporary restraining order and the hearing on the rule to show cause by service of process as required by law within twenty-four hours of the issuance of the order.

6

**Assignment of Error**

The sole issue Mr. Fulton raises before this Court is whether the trial court erred in granting the Domestic Abuse Order against him. His sole assigned error is that "[t]he trial court erred in granting an Order of Protection when Ms. [Pollard] failed to prove by a preponderance of evidence the occurrences of domestic abuse, resulting from physical abuse or any offense as defined in the Criminal Code of Louisiana, against Ms. Fulton and the minor children."

In his brief, Mr. Fulton mentions only the two most recent incidents of alleged abuse—the June 2024 and August 2023 incidents; he observes:[13]

> [**June 2024 Incident**:] Ms. [Pollard] testified that on or about June 3rd or 4th, 2024, Appellant, [Mr. Fulton], "punched her in the back of my head, wrapped his hand around my hair, and he slung me to the ground there's a police report." Ms. [Pollard] also testified that Mr. Fulton was not arrested after statements were taken and that cameras in the area did not have clear footage of the incident. Ms. [Pollard] went on to attempt to introduce an item number as a police report. Ms. [Pollard] testified, "[I] went to the emergency room" as a result of the incident. When asked by the court whether she had a medical history written by the doctor about the incident, Ms. [Pollard] failed to produce a medical report as to what happened on the day she said she reported to the emergency room.

> [**August 2023 Incident**:] Ms. [Pollard] went on to testify that on August 3, 202[3], she went to the home (the former family home) of Mr. Fulton to have a conversation about the kids while they were present. Ms. [Pollard] alleges that Mr. Fulton pushed her as she tried to leave when the conversation turned away from the kids.

Given the June 2024 and August 2023 incidents are the most recent incidents coupled with the fact that these two incidents are the ones both parties listed in their petitions for protection from abuse, we focus on these two incidents in this opinion. To provide a background for deciding this case, we outline the evidence in the record regarding these two incidents.

_____

[13] Ms. Pollard failed to file an appellee brief or participate in this appeal in any manner.

*June 2024 Incident*

In his verified petition, Mr. Fulton wrote that in June 2024, Ms. Pollard came to his house and started a fight. In her verified petition, Ms. Pollard summarized the June 2024 incident as follows:

> [Mr. Fulton] & our son [Minor One] got into an altercation. I left work on a lunch break at about 10:15 a.m. to go and pick up [Minor One]; [Mr. Fulton] called my phone asking me to stay so that he can talk to [Minor One]. I stayed around so that he can talk to [Minor One] which after about 5 min[ute]s into [Minor One] and [Mr. Fulton] talking [Mr. Fulton] then proceeding with threatening to beat [Minor One] up. [Minor Two] got in between the two to try and stop it but the[y] both would keep coming towards each other. [Minor Two] then got [Minor One] into the car so I started to walk towards the driver side & [Mr. Fulton] punched me in the face. [Minor One] jumped backed [sic] out the car to go back after his daddy when [Minor Two] tackled him to the ground. I went and got both of them off the ground and we was leaning on the truck surrounding [Minor One]. [Mr. Fulton] came & pushed [Major Child] out the way to get to [Minor One]. I pushed [Minor One] toward [Minor Two] & told [Minor Two] to put [Minor One] in the car. [Mr. Fulton] then pointed his finger in my face & said I'm the f—ing reason they act the way they do punching me in head, pulling my hair out & throwing me to the ground.

At the hearing on Ms. Pollard's Petition, the trial judge questioned both parties regarding the June 2024 incident. Ms. Pollard's response tracked her written description in her petition. She testified that the physical abuse in connection with this incident was that "[Mr. Fulton] punched [her] in [the] face"; and "he punched [her] in the back of [her] head, wrapped his hand around [her] hair, and he slung [her] to the ground." She further testified that following this incident she called the police and was treated in the emergency room.

In contrast, Mr. Fulton's response to the trial court judge's questioning regarding the June 2024 incident was as follows:[14]

---

[14] Because this case is largely dependent upon the live testimony, we recount this portion of that testimony with little abbreviation.

Back in August [2024], I filed a petition to have Ms. Pollard to not be able to come to the house until the house is sold. She declined the agents the rights to list the house so that we could part ways fully. When I came to Court, all this she'[s] talking about about going to the Hospital and all this, she didn't mention it. It's in your Minutes. You can check and see. The only thing she mentioned that I contact her for sex. She never mention anything about being injured. . . .

[I] did discipline [Minor One]. I never swung a lick. I never took no belt off. I grabbed [Minor One]. Me nor [Minor One] never passed a lick. We never swung on each other. It was just me physically grabbing me [sic]. Now, [Minor One] is a senior in high school playing football, so, yes, he's a young man and feeling like he could challenge somebody. He just challenged the wrong person. I never hit him. I never abused him. We did get in a tussle on the ground. As I'm tussling, who jumps on my back? Ms. Pollard. In the minutes, Ms. Pollard never told—Ms. Pollard said that I hit her three times. In the minutes from last time in August, she never said anything about that. So when me and [Minor One] did get into it, me and Ms. Pollard got into it afterwards, that's when Ms. Pollard called the police. When she called the police, your honor, I never—at that particular point, never had been in the residence. This happened in the front yard. She called the police and told the police that I have a gun on me, and I'm in my work clothes. I'm in my uniform. She said: oh, he got guns. This—so yes, the police did come. Two units came. After the two units, a man and a woman, the lieutenant came, so you had three officers out there. They all pulled everybody to the side. They pulled me, [Major Child], [Minor One], and [Minor Two] to the side individually. And they interviewed all of us. They gave me and [Minor One] a domestic dispute. That's why nobody was taken to jail because the altercation happened between me and [Minor One], not Ms. Pollard. So that's why no police report was ever written. They gave me and [Minor One] a domestic dispute. And they said if they was ever called back at that residence pertaining to me and him, then it would estimate to a domestic violence. So that's why it never happened. The police asked Ms.. Pollard. They asked everybody. Then [Major Child] and [Minor One]—Ms. Pollard momma came and her siblings came. When her momma came – her momma threatened—got out the car to bust me up side the head with a md 20 20 bottle, which is alcohol. So as she went to doing all that and talking about—and when Ms. Pollard mentioned to the police that I had guns when I never been in the house, [Minor One] and [Minor Two] raised up and started punching the walls, punching the columns, busting their knuckles up. They had blood—scratched up knuckles, both of them. [Minor Two] was complaining about his wrist. [Minor One] had just started a job. Neither of them were able to go to work that particular night—that particular evening because they both had sore hands. So when the police came, they saw the scratches all on them. They asked everybody was anybody injured, do anybody need to go to the hospital, do we need to get EMS. Everybody on the scene said no, including Ms.

Pollard. So if she comes back—when we came in August 3rd, [2024] and you asked her about the most recent event, she never mentioned anything about no—going to the hospital, having disc broke or whatever. Ms. Pollard was suffering with an injury that she was going to therapy with for her job, so whatever injury that she had is probably the same injury that she had when she was at her job. . . . Now all of a sudden you went to the hospital. She didn't mention this in the last time we was at court. That was an incident between me and [Minor One] that Ms. Pollard didn't have no business in getting into. She didn't have no reason to come to that resident [sic]. I didn't call her. When she came and got [Minor One], she could've left.

*August 2023 Incident*

In his petition, Mr. Fulton wrote that in August 2023, Ms. Pollard called his girlfriend—Sharonda Jackson—and that Ms. Pollard came to his house and started a fight. In her verified petition, Ms. Pollard described the August 2023 incident as follows:

> [Minor Two] came to me wanting to talk about some things that had been going on by their daddy house. Out of respect me knowing that their daddy girlfriend had been moved in I contacted her letting her know I needed to come over & have a sit down amongst my kids & their daddy. Sharonda got in feelings among me & her talking & went back & called [Mr. Fulton]. [Mr. Fulton] called me on the phone telling me Sharonda was gone I can meet at the house to talk with him & kids. Once I got to house we stayed in the living room talking; [Mr. Fulton] wanted to talk about boyfriend when I wanted to talk about kids. After I seen he wasn't letting boyfriend talk go, I told him I'm leaving as I got up to walk out of door he pushed me & said I'm not going no where. [Minor One] and [Minor Three] got in between when [Minor One] said come on ma I'll walk you out.

At the hearing on Ms. Pollard's petition, the trial court judge questioned Ms. Pollard about the August 2023 incident. Her response tracked her written description set forth in her petition. She testified that the physical abuse in connection with this incident was that when she attempted to leave Mr. Fulton's house, "he jump[ed] in front of the walkway, and he pushe[d] [her]." In his testimony at the hearing on Ms. Pollard's Petition, Mr. Fulton did not address the August 2023 incident.

**Analysis**

The narrow issue presented here is whether the trial court erred in granting the Domestic Abuse Order. A preponderance of the evidence standard of proof applies. *See Rodriguez v. Claassen*, 16-0610, 16-0611, pp. 9-10 (La. App. 4 Cir. 12/21/16), 207 So.3d 490, 496-97. "Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence, both direct and circumstantial, shows that the fact sought to be proved is more probable than not." *Patterson v. Charles*, 19-0333, p. 10 (La. App. 4 Cir. 9/11/19), 282 So.3d 1075, 1083 (internal citations omitted).

Procedurally, a petitioner must describe in the petition "[t]he facts and circumstances concerning the alleged [domestic] abuse." La. R.S. 46:2134.[15] Battery is the physical abuse proscribed by the domestic abuse statute. *McCann v. McCann*, 09-1341, p. 7 (La. App. 3 Cir. 3/10/10), 33 So.3d 389, 394; *Harper v. Harper*, 537 So.2d 282, 285 (La. App. 4th Cir. 1988); see La. R.S. 14:33 (defining battery as "the intentional use of force or violence upon the person of another"). Here, Ms. Pollard, in her verified petition and her testimony at the hearing on her petition presented facts that, if believed, establish Mr. Fulton committed a battery on her on at least two occasions—during the August 2023 and June 2024 incidents.

Mr. Fulton first argues that Ms. Pollard failed to mention any physical abuse at the earlier hearing on his petition. A review of the transcript of that hearing belies his argument. At that earlier hearing, Ms. Pollard testified that "when [Mr.] Fulton tried to fight my son [Minor One] . . . I pushed [Minor One] to [Minor

---

[15] As the Supreme Court has observed, "[b]y requiring the party seeking a protective order to file a petition specifying the allegations of abuse, the legislature has ensured that a defendant's Constitutional due process rights, particularly the right of reasonable notice, will be observed." *Bays v. Bays*, 00-1727, p. 6 (La. 2/21/01), 779 So.2d 754, 758.

Two], and told [Minor Two] to go put him in the car. In the midst of it all, [Mr. Fulton] beat me up."[16]

Mr. Fulton next contends that Ms. Pollard's allegations of domestic abuse are unsubstantiated by the physical evidence she presented at trial—the hearing on Ms. Pollard's Petition; thus, he contends there was no showing of proof that the violence had taken place and that immediate and present danger of abuse existed. Here, no physical evidence actually was introduced into the record at the hearing. During the hearing, Ms. Pollard, appearing *pro se*, presented physical evidence to the trial court judge—medical records, photographs of her injuries, and a purported police report. The trial court judge instructed Ms. Pollard that she was required to first show these items to Mr. Fulton before the judge could view them. After viewing the items, the judge questioned Ms. Pollard if she had a medical history written by a doctor about the incident. Ms. Pollard replied that she did not have any other medical records. As to the purported police report, the trial court corrected Ms. Pollard that it was only an item number—not a police report—and that it could not be considered. Regardless, the items were not offered or introduced into evidence. The items are not in the record on appeal. But, contrary to Mr. Fulton's suggestion, physical evidence is not necessary to establish domestic abuse. Although physical evidence can be used to build a stronger case of abuse, it is not a requirement. This argument is unpersuasive.[17]

---

[16] Although she referenced August 5th, Ms. Pollard was referring to the June 2024 incident. Regardless, contrary to Mr. Fulton's suggestion, Ms. Pollard testified at the earlier hearing that he beat her up.

[17] *See T.F. on behalf of E.F. v. C.*G., No. 23-1761, 2025 WL 412059, at *2 (Iowa Ct. App. Feb. 5, 2025) (observing that "corroboration of victim testimony is not required in criminal cases for proof beyond a reasonable doubt.. . .And it certainly is not required under the preponderance standard here" required for a finding of domestic abuse).

Mr. Fulton next contends that Ms. Pollard failed to timely voice any complaints of abuse. He cites the fact that "the parties had long been separated since May 13, 2021, without incident." Mr. Fulton's suggestion that Ms. Pollard's abuse allegations are not legitimate because of her delay in voicing them is unpersuasive. A similar argument was rejected by this Court in *Breaux v. Tipton*, 18-0429 (La. App. 4 Cir. 11/14/18), 259 So.3d 429.

In *Breaux*, the appellant contended that the appellee "had no urgency in bringing charges of domestic violence, proposing this evidences a lack of legitimacy." 18-0429, p. 6, 259 So.3d at 434. Rejecting this argument, we observed:

> [Appellant] questions why [Appellee] delayed reporting the incidents of abuse, suggesting this delay made the allegations less credible. However, the alleged abuse itself is not required to be recent in order to merit a grant of a protective order. La. R.S. § 46:2135(A). Further, the trial court is mandated to consider past history of threats or abuse in determining whether to grant a protective order. *Id*. While conflicting evidence was presented, the trial court had the benefit of hearing the testimony of both witnesses and making credibility determinations.

*Breaux*, 18-0429, p. 7, 259 So.3d at 434. The same holds true here.

Moreover, the most recent incident of abuse that Ms. Pollard alleges occurred in June 2024—only two months before she filed her verified complaint. When, as here, the parties present diametrically opposing versions of the alleged abuse incidents, the trial court is entitled to judge the parties' credibility. *Breaux*, *supra*. Implicit in the trial court's ruling is a finding that Ms. Pollard's version was determined to be more credible.

Finally, Mr. Fulton contends there is no proof that the Minor Children were in imminent danger of violence by him. But, the Minor Children are all mentioned in the descriptions and testimony regarding the abuse incidents. The trial court,

13

thus, made an implicit determination that the Minor Children's safety dictated including them in the order. Mr. Fulton also contends that "the parties had been exercising joint custody of the Minor Children without incident without a Court order by amicable agreement for almost three years." Contrary to Mr. Fulton's contention, the record does not support a finding that the parties have been exercising joint custody without incident. Ms. Pollard's Petition was the second time the parties appeared before the trial court seeking a protective order for issues arising out of their mutual agreement to share joint custody without a judicial custody decree. Given the protective order serves not only to alleviate the established friction caused by the lack of a judicial custody decree but also to ensure the Minor Children's safety, the trial court did not abuse its discretion in including the Minor Children in the order.[18]

In sum, given the overall circumstances presented here, we cannot conclude that the trial court abused its discretion in granting the Domestic Abuse Order.

## **DECREE**

For the foregoing reasons, the judgment of the trial court granting the Domestic Abuse Order in favor of Ms. Pollard and the Minor Children and against Mr. Fulton is affirmed.

**AFFIRMED**

---

[18] As a commentator has observed, "since visitation provides the batterer with continued access to the victim through the children, violence against the petitioner often continues when visitation is allowed. . . . (v)isitation remains a catalyst for continued intimidation and abuse." Sean D. Thueson, *Civil Domestic Violence Protection Orders in Wyoming: Do They Protect Victims of Domestic Violence?*, 4 WYO. L. REV. 271, 291 (2004) (internal footnotes and quotations omitted).